MARYLAND COMMITTEE FOR FAIR REPRESENTATION ET AL. *v.* TAWES, GOVERNOR ET AL.

[No. 140, Adv., September Term, 1962.]

*Decided per curiam, July 23, 1962.*

*Motion for rehearing, filed August 2, 1962, denied September 11, 1962.*

*Opinions filed September 25, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY, MARBURY and MACGILL, Associate Judge of the Fifth Judicial Circuit, specially assigned, JJ.

*Alfred L. Scanlan,* with whom were *Shea & Gardner, John B. Wright* and *Johnson Bowie,* on the brief, for appellants.

*Thomas B. Finan, Attorney General,* and *Joseph S. Kaufman, Deputy Attorney General,* with whom were *Morris Turk, Attorney for Board of Election Supervisors for Anne Arundel County,* on the brief, for appellees.

Brief Amicus Curiae filed by Montgomery County, Maryland. *Alfred H. Carter, County Attorney for Montgomery County,* and *Richard J. Sincoff, Assistant County Attorney,* on the brief.

HENDERSON, J., delivered the opinion of the Court.

On July 23, 1962, we filed a per curiam order affirming a declaratory decree of the Circuit Court for Anne Arundel County that Article III, sec. 2 of the Maryland Constitution is valid and constitutional. We now state the reasons for our order.

This is the third time this case has been before this Court. On April 24, 1962, following the Supreme Court's ruling in *Baker v. Carr,* 369 U. S. 186, and its per curiam order in *Scholle v. Hare,* 369 U. S. 429, we reversed a decision of the Circuit Court for Anne Arundel County which had sustained the appellees' demurrers to the bill of complaint. We held, by a divided court, that the bill, alleging that the apportionment prescribed by the Maryland Constitution violated the Fourteenth Amendment to the United States Constitution, stated a justiciable cause of action cognizable in the State courts, and remanded the case in order that the chancellor might determine "whether or not an invidious discrimination does exist with respect to representation in either or both houses." *Md. Committee v. Tawes,* 228 Md. 412, 436. We also said that "inquiry into the rational basis for such apportionment seems to be called for."

On May 28, 1962, the chancellor, after argument but without hearing testimony, held on motion for summary judgment that the composition of the House of Delegates, prescribed by Article III, sec. 5 of the Maryland Constitution, violated the Fourteenth Amendment, in that the distribution of numerical voting strength in voting for members of the House of Delegates, accorded to voters in the four suburban and more populous counties, was arbitrary and unreasonable. He reserved decision as to the Senate.

The Governor promptly convened a special session of the General Assembly, which for the first time in the history of this State added nineteen Delegates to the House of Delegates, to be voted for in the 1962 elections, by "stop-gap" legislation rather than by proposing a constitutional amendment. A proposed constitutional amendment failed of passage. The apellants entered an appeal from the chancellor's order reserving decision as to the Senate and we remanded the case with di-

rections that the chancellor decide the point. The present appeal is from that decision. No question is presented as to the validity of the "stop-gap" legislation or the reapportionment of the House of Delegates.

Article III, section 1 of the Maryland Constitution provides: "The Legislature shall consist of two distinct branches; a Senate, and a House of Delegates, and shall be styled the General Assembly of Maryland."

Art. III, sec. 2 provides: "The City of Baltimore shall be divided into six legislative districts as near as may be of equal population and of contiguous territory, and each of said legislative districts of Baltimore City, as they may from time to time be laid out, in accordance with the provisions hereof, and each county in the State, shall be entitled to one Senator, who shall be elected by the qualified voters of the said legislative districts of Baltimore City and of the counties of the State, respectively, and shall serve for four years from the date of his election."

Throughout the colonial period the upper house consisted of the Governor and Council, appointed by the proprietor, and modeled after the English House of Lords. They also sat as a provincial court and court of appeals from the county courts. See Bond, Court of Appeals of Maryland, p. 4 et seq. See also 1 McMahon, Historical View of the Government of Maryland (1831), p. 148. That they had a certain sectional distribution was fortuitous. While the House of Delegates was selected on a county basis (four from each) the councilors were selected from among the most eminent landowners and office holders, serving at the will of the Governor.[1] In the Constitution of 1776, Art. XV provided for a Senate to be elected by the vote of Delegates elected two from each county and one each from the City of Annapolis and Baltimore Town. At that time there were eight counties on the eastern shore and ten counties on

---

1. The last colonial legislature convened on March 23, 1774, and the twelve councilors present were: Benedict Calvert, John Ridout, John Beale Bordley, George Stewart, Daniel of St. Thomas Jenifer, Benjamin Ogle, Philip Thomas Lee, Richard Lee, William Hayward, Daniel Dulany (the Younger), William Fitzhugh and George Plater. Archives of Md. LXIV.

the western shore. These electors were directed to elect six senators from residents of the eastern shore and nine senators from residents of the western shore, "men of the most wisdom, experience and virtue, above twenty-five years of age, residents of the state above three whole years next preceding the election, and having therein real and personal property above the value of one thousand pounds current money." See Niles, Maryland Constitutional Law, p. 5. By the amendment proposed by Chapter 197, Acts of 1836, and ratified in 1837, the Senate was reconstituted to consist of one senator from each county (of which there were then twenty by reason of the establishment of Allegany and Carroll Counties) and one from Baltimore City. The method of indirect election by an electoral college was abandoned. This distribution was continued in the Constitution of 1851, and so far as the counties are concerned, was continued in the Constitutions of 1864 and 1867, and in subsequent amendments. The last county to be formed, Garrett, was erected in 1872. See 3 Scharf, History of Maryland, p. 778. From that date the counties have numbered twenty-three.

However, Baltimore City, which had achieved the status of a political subdivision independent of Baltimore County in 1851, was allotted three senators, one from each legislative district, in 1864 and this provision was continued in 1867. It received an additional legislative district and senator in 1900 and two more in 1922, subsequent to the annexation of portions of Baltimore County and Anne Arundel County by Chapter 82 of the Acts of 1918.

The counties of Maryland have always been an integral part of the state government. St. Mary's County was established in 1634 contemporaneous with the establishment of the proprietary government, probably on the model of the English shire, associated with the important office of sheriff. 1 Scharf, *supra*, p. 124 et seq. Indeed, Kent County had been established by Claiborne before the landing of the Marylanders and he established New Kent County in Virginia after he was ousted from Maryland *vi et armis* by the Calverts. We have noted that there were eighteen counties at the time of the adoption of the Constitution of 1776. They have always possessed and retained

distinct individualities, possibly because of the diversity of terrain and occupation. Baltimore County, the most populous in the State, still has no incorporated towns, and until the recent adoption of a charter form of government, was governed by three elected commissioners who exercised the executive functions, while most of the legislative functions were exercised by its representatives in the General Assembly. Baltimore City, having acquired the unique status of an independent political subdivision, has maintained its own local government, subject to control by the General Assembly, since 1867. Only two counties, Montgomery and Baltimore have adopted the charter form of government under Art. XI of the State Constitution. While it is true that the counties are not sovereign bodies, having only the status of municipal corporations, *Howard County v. Matthews,* 146 Md. 553, 561, they have traditionally exercised wide governmental powers in the fields of education, welfare, police, taxation, roads, sanitation, health and the administration of justice, with a minimum of supervision by the State. In the diversity of their interests and their local autonomy, they are quite analogous to the states, in relation to the United States.

It is an interesting historical fact that the mode of selecting the members of the United States Senate adopted in 1789 was modeled, to a considerable extent, upon the Maryland Senate of 1776. In addressing the Constitutional Convention on August 14, 1787, Madison opposed a proposal that senators be paid by the states on the ground that it would tend to impair the stability and independence of the Senate, which, he remarked, "was formed on the model of that of Maryland." 4 The Writings of James Madison, edited by Gaillard Hunt, G. B. Putnam's Sons (1903) p. 202. Again, in No. 63 of The Federalist Papers, Madison in answering a contention that a Senate appointed not immediately by the people, and for a term of six years, would acquire a dangerous preeminence in the government and finally transform it into a tyrannical aristocracy, stated that "the constitution of Maryland furnishes the most apposite example. The senate of that State is elected, as the Federal Senate will be, indirectly by the people; and for a term less by one year only, * * *. If the Federal Senate, therefore,

really contained the danger which has been so loudly proclaimed, some symptoms at least of a like danger ought by this time to have been betrayed by the senate of Maryland; but no such symptoms have appeared. On the contrary * * * the Maryland constitution is daily deriving from the salutary operation of this part of it, a reputation in which it will probably not be rivalled by that of any State in the Union". The members of the Federal Senate continued to be elected by the state legislatures until the adoption of the Seventeenth Amendment in 1913. It is also interesting to note that when Maryland abandoned the selection of state senators by an electoral college in 1837, it adopted a provision for one senator from each county and from Baltimore City, following the federal pattern of geographical representation in the upper house.

The question before us is not whether such a provision is wise or unwise but simply whether, as alleged in the bill, membership in both houses of a bicameral legislature must "be based on, or reasonably related to, the present population" of the various political subdivisions of the State. Since the provision of one senator from each county has been repeatedly approved and incorporated in the Maryland Constitution by the people of Maryland, it cannot conceivably offend the Maryland Constitution. The sole claim is that it violates the equal protection clause of the Fourteenth Amendment.

Equal protection has been judicially equated to a prohibition against invidious discrimination. *Williamson v. Lee Optical Co.,* 348 U. S. 483, 489. Not every discrimination is invidious, nor will it be set aside "if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland,* 366 U. S. 420, 426 and cases cited. We think a complete justification for the election of state senators on a county basis is to be found in the historical precedents cited above. The idea of a bicameral legislature, with the upper branch selected on a territorial rather than a popular basis, was a familiar one in 1837 and it is familiar today. The very purpose of having two houses was that each would be a check upon the other, and prevent the passage of hasty and ill-conceived legislation. A different method of selection was essential to the bicameral plan. No more natural or logical basis could be suggested than

that the viable and long established political subdivisions be accorded representation, as they had been in election of electors under the Constitution of 1776.

The bicameral concept is not one that has become obsolete with the passage of the years. It has been repeatedly recognized by Congress and the President, subsequent to the adoption of the Fourteenth Amendment, in approving the constitutions of states seeking admission to the Union. See *Coyle v. Smith,* 221 U. S. 559. In the most recent cases, Alaska and Hawaii, their Constitutions each contain provisions for senatorial districts of marked inequality in popular representation. In Alaska one of the senators represents more than fifteen times as many voters as the other. Moreover, the constitutions of a majority of the states that ratified the Fourteenth Amendment contained provisions for an upper house based on a geographical distribution of senators, without reference to population. It can hardly be maintained that in voting for ratification they were, in effect, voting to invalidate their own state constitutions.

The appellants argue that the Federal Constitution furnishes neither analogy nor precedent for the composition of the Maryland Senate, on the ground that the states which adopted the Federal Constitution were sovereign bodies. The argument overlooks the fact that thirty-seven states were admitted to the Union after 1789, which were not and had never been sovereign bodies, with the possible exception of Texas. It also overlooks the fact that it was never suggested that senators vote by states. They were clearly members of a national congress, designed for the very purpose of achieving a greater stability and a stronger central government than under the Articles of Confederation. In any event, the consequence and effect upon voting rights are the same, whether the voter be voting for United States senator or state senator. We think it is hardly conceivable that a different principle would apply in the one case than in the other.

We are of course aware that the government of the United States, within its delegated powers, may possess rights not retained by the states. But where civil rights are concerned there is still truth in the ancient adage that what is sauce for the

goose is sauce for the gander. When the Supreme Court held in *Brown v. Board of Education,* 347 U. S. 483, that the equal protection clause prohibited the states from maintaining racially segregated schools, it also held in *Bolling v. Sharpe,* 347 U. S. 497, decided the same day, that the Federal Government was likewise barred by the Fifth Amendment. The relation between the two amendments seems sufficiently close to negative a conclusion that a provision like that for the Federal Senate, U. S. Const., Art. I, sec. 3, would be offensive to either.

The appellants argue, however, that the federal plan has not been followed in Maryland, since an exception has been made in the case of Baltimore City, which has been subdivided into six election districts and now has six senators. The argument proves too much. The fact that the original plan has been modified in one instance does not require that it be totally abandoned. There are reasons for a distinction. In 1864, when Baltimore City acquired three senators, the State was in the control of the Union Army and many of the southern sympathizers in southern Maryland and the eastern shore had been disfranchised. There were special reasons for the continuance of extra representation in 1867, in 1900, and again in 1920, when the population of Baltimore comprised fifty-one per cent of the population of the State. Baltimore, even prior to the Civil War, was a great seaport, an industrial center and the hub of commerce and communication. Despite the distrust for city governments, dominated around the turn of the century by "rings" and "bossism", it mustered enough political power to enlarge its representation. Until quite recently it has been underrepresented in the House of Delegates as well as in the Senate, although the picture has changed with the population explosion in the suburban counties, and it is not far out of line. The instant case is a contest for political power between the larger and the smaller counties, and Baltimore City is not concerned. It may also be noted that there is no constitutional requirement of territorial uniformity under the Fourteenth Amendment. *Salsburg v. Maryland,* 346 U. S. 545; *Ocampo v. United States,* 234 U. S. 91.

We find nothing in the Supreme Court cases to support the appellants' claim of invalidity in the apportionment of the

Maryland Senate. *Baker v. Carr, supra,* merely decided that a justiciable question was presented. The remand in *Scholle v. Hare, supra,* was for the express purpose of allowing the Michigan Court to give further consideration to the question presented in the light of *Baker v. Carr.* We do not read into that remand any intimation as to how the case should be decided on the merits. Nor do we attach any significance to the similar remand in the New York case of *W. M. C. A., Inc. v. Simon,* 370 U. S. 190. Upon remand, the Michigan Court, by a vote of four to three, held that in "[t]he absence of any semblance of design or plan in the present senatorial districts," the state constitutional provision approved by the voters in 1952, was invalid. But Mr. Justice Stewart stayed the order for reapportionment, stating: "It is very clear the issues decided by the Michigan Supreme Court are new issues; ones that were not decided in *Baker v. Carr."* We think it is significant that Mr. Justice Stewart, concurring in the *Baker* case, said: "The Court does not say or imply that there is anything in the Federal Constitution 'to prevent a State, acting not irrationally, from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people.' * * *."

"In *MacDougall v. Green,* 335 U. S. 281, the Court held that the Equal Protection Clause does not 'deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.' * * *." We find no intimation in later Supreme Court cases that this is not still the law.

We think there is little to be gained from a review of cases in other states and in the lower federal courts. A typical statement is that of the Tennessee Court upon remand of *Baker v. Carr.* 31 L.W. 2003 (June 22, 1962) : "[E]qual protection requires that * * * apportionment in at least one house shall be based, fully and in good faith, on numbers of qualified voters without regard to any other factor." See also *Sims v. Frink,* 30 L.W. 2512 (Ala.), *Toombs v. Fortson,* 30 L.W. 2605 (Ga.) (May 25, 1962) and *Caesar v. Williams,* 371 P. 2d 241 (Ida.)

rehearing denied May 8, 1962. In reading some of the decisions attention must be paid to whether the particular constitution requires representation based on population in both houses, as some do. The action taken by state or lower federal courts, once the question of justiciability is conceded, may turn on the construction of the state constitution and not present a federal question at all. Such cases are readily distinguishable. In any event, there is no unanimity of opinion to be drawn from the cases, and the final determination must await further light from the Supreme Court of the United States.

BRUNE, C. J., filed the following dissenting opinion, in which PRESCOTT and MARBURY, JJ., concurred.[1]

The question on this appeal is fundamentally one of Federal constitutional law—the meaning and application of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States with regard to the apportionment of representation in the legislature of a State. That was also true on the first appeal, but the question as then presented was two-pronged and related to the apportionment of representation (a) in the House of Delegates and (b) in the Senate of the General Assembly of Maryland. As a result of legislation enacted after the first appeal, the present controversy is limited to the apportionment of representation in the State Senate. The trial court determined, following a second remand of the case, that if the House were properly apportioned (as he thought it had been by the Special Session of the General Assembly following the determination just prior to the Special Session that its then existing apportionment would not be sustainable as to the 1962 election), there was no need to reapportion representation in the Senate on any basis of population. He based his conclusion upon an analogy to the Federal system under which the House of Representatives is apportioned on the basis of population, but each of the States, regardless of population, has two members of the Senate. He accordingly dismissed the bill as to reapportionment of the Senate. By a per

---

1. But for the recent (and fortunately temporary) illness of Judge Prescott, who wrote the majority opinion on the first appeal in this case, this opinion would have been written by him.

curiam order joined in by four of the seven judges this Court affirmed the order of dismissal. We dissented.

In the majority opinion on the first appeal, *Maryland Committee for Fair Representation v. Tawes*, 228 Md. 412, 180 A. 2d 656, we stated some familiar propositions which are equally apposite here: that the Constitution of the United States and laws made in pursuance thereof are parts of the supreme law of the land and are paramount to any contrary provisions of the Constitution or laws of this State, that this is so both under the Supremacy Clause of the Constitution of the United States and under Article 2 of the Maryland Declaration of Rights, the latter in effect writing into our State Constitution this limitation upon everything else therein expressed; and that interpretations of the Constitution of the United States by the Supreme Court of the United States are binding upon us. We believe that there is no dispute or difference between the members of this Court on those propositions. The last of them was recognized by the majority opinion on the first appeal and 428 (228 Md., at 418) and also by the dissenting opinion (228 Md., at 448). Our difference with the present majority is based upon our understanding of the effect of recent decisions of the Supreme Court bearing upon the subject in hand.

The first of those cases is, of course, *Baker v. Carr*, 369 U. S. 186. It makes clear, we think, that the Equal Protection Clause of the Fourteenth Amendment does afford protection against the debasement or dilution of voting rights through State legislative apportionment of representation. The exact point at which such protection will be afforded in any specific case, it is true, is not determined in *Baker v. Carr;* nor, we think, could it well have been. The basis of the claim of the plaintiffs-appellants was discrimination through the debasement or dilution of their voting rights through the apportionment of representation in the Tennessee Legislature (both houses) without regard to population. The second proposition determined by the Supreme Court is thus stated (369 U. S., at 197-98, 82 S. Ct., at 699): "(b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief." And near the end of the opinion of the Court, Mr. Justice Brennan further said (369 U. S., at 237, 82 S. Ct. at 720): "We conclude

that the complaint's allegations of a denial of equal protection present a justiciable constitutional cause of action upon which appellants are entitled to a trial and a decision. The right asserted is within the reach of judicial protection under the Fourteenth Amendment."

We think it also clear both from what we have just quoted and from footnote 15 to the opinion of the Court in *Baker* that the right for which the appellants were entitled to seek protection and which might be found, upon trial of the merits, to have been violated was a Federal constitutional right. Footnote 15 (369 U. S., at 195, 82 S. Ct., at 698) reads in part as follows: "The complaint, in addition to the claims under the Federal Constitution, also alleges rights, and the General Assembly's duties, under the Tennessee Constitution. Since we hold that appellants have—if it develops at trial that the facts support the allegations—a cognizable federal constitutional cause of action resting in no degree on rights guaranteed or putatively guaranteed by the Tennessee Constitution, we do not consider, let alone enforce, rights under a State Constitution which go further than the protections of the Fourteenth Amendment."

The majority opinion in the instant case appears to take a different view and to confuse the remedy with the right. In the last paragraph of the majority opinion cases in other States and in the lower Federal courts are dismissed with the comment that "there is little to be gained from a review of [such] cases." The opinion cites several of them decided since *Baker* and then goes on to say:

> "In reading some of the decisions attention must be paid to whether the particular constitution requires representation based on population in both houses, as some do. The action taken by state or lower federal courts, once the question of justiciability is conceded, may turn on the construction of the state constitution and not present a federal question at all."

Where compliance with State constitutional requirements will also vindicate the Federal right shown to have been infringed, a decree in accordance with State constitutional provisions is

an obviously desirable form of remedy and the otherwise possibly very difficult problem of determining an appropriate remedy (a problem not solved by *Baker*) may become relatively simple. However, it remains clear under *Baker* that a Federal right exists quite independent of State constitutional provisions and is in no way dependent upon them for its enforcement through some appropriate remedy.

The second recent Supreme Court case which seems to us highly pertinent to the present controversy is *Scholle v. Hare*, 369 U. S. 429. That case involves an attack solely on the apportionment of the Michigan Senate. The Michigan House is apportioned about as closely as may be on a basis of population. This fact was certainly well known to the Supreme Court of the United States when it remanded the *Scholle* case to the Supreme Court of Michigan for further consideration in the light of *Baker v. Carr, supra*. It is difficult for us to imagine a clearer indication (short of an express statement) than is given by this remand that the mere fact that one house of a State legislature is apportioned strictly in accordance with population does not immunize the apportionment of the other from attack under the Fourteenth Amendment on the ground that gross malapportionment or representation as regards population constitutes invidious discrimination.

In the majority opinion of this Court on the first appeal in this case we expressed the views (228 Md., at 433-34) that no precise and inflexible formula for representation is required or can be stated, that the State is allowed every reasonable latitude with regard thereto and that any discrimination which may exist therein will not be set aside if any state of facts reasonably may be conceived to justify it, and that "there is a strong implication in the *Baker* decision that there must be some reasonable relationship of population, or eligible voters, to representation in the General Assembly, if an apportionment is to escape the label of constitutionally-prohibited invidious discrimination." We adhere to those views and we think the remand of the *Scholle* case supports them. The remand of that case appears to us to have been for the purpose of having the Michigan Court determine whether or not there was a rational ground upon which to support the allocation of representation

in the Michigan Senate, which rather clearly involved marked disparities in voting power between different senatorial districts as regards population. The maximum disparity in Michigan, we note, was approximately 15 to 1 as against a maximum disparity in Maryland of approximately 32 to 1. We think that the remand of the case of *W. M. C. A. v. Simon,* 370 U. S. 190, 82 S. Ct. 1234, for the court below (the United States District Court for the Southern District of New York) to be "the first to consider the merits of the federal constitutional claim, free from any doubts as to its justiciability and as to the merits of alleged arbitrary and invidious geographical discrimination" supports our interpretation of the purpose of the remand of the *Scholle* case. As we read the opinions filed in the Michigan Supreme Court following remand, the Court divided sharply on whether there was or was not a rational basis for the Michigan senatorial apportionment fixed by a constitutional amendment adopted in that State in 1952. In at least one respect, which may be of some significance, the Michigan case differs from the situation in Maryland. There, at the same election at which the apportionment under attack in *Scholle* was adopted by a popular majority of approximately 300,000 votes, another proposed constitutional amendment which would have apportioned the Senate on the basis of population was defeated by a popular majority of approximately 500,000 votes.[2] No similar choice has ever been submitted to popular vote in Maryland. Despite this popular vote and against historical-geographical arguments and the analogy to the Federal system, a majority of four out of the seven members of the Michigan Supreme Court participating held the 1952 apportionment invalid. The case is now on appeal to the Supreme Court and the order of the Supreme Court of Michigan has been stayed by Mr. Justice Stewart.

The majority of this Court in the present case seems to accept tacitly, if not expressly, the view that if one house of the Maryland General Assembly (the Senate) may be apportioned

---

2. Cf. *W. M. C. A. v. Simon* on remand, 31 L.W. 2121, where a somewhat similar factor was one of several grounds upon which the existing New York apportionment was upheld.

on a basis which ignores disparities of population, the other house (the House of Delegates) must be apportioned with due regard to population, and assumes that the House of Delegates now is so apportioned. It is true that the apportionment of the House is not under attack on this appeal and no question with regard thereto is now before us. It is also true, however, that even as reapportioned by the May 1962 Special Session of the General Assembly, considerable disparities still exist in a number of instances, though previous disparities have been materially reduced. Reference to Appendix A appended hereto will show the past and present situations with regard to the House and also the situation with regard to the Senate, which has not changed. There is no such close relationship between population and representation as in the case of the Michigan House, or between registered voters and representation as is declared necessary by the Federal District Court in Tennessee after remand of the *Baker* case. (31 L.W. 2003). Surely, the present Maryland apportionment is not so closely related to population as is that of the House of Representatives of the Congress of the United States. In that respect the Federal analogy is far from perfect.

Nor is it perfect in other respects. We still believe that there is some difference between the relationship of the States and the National Government and that of the counties and the State Government. We do not deny that State sovereignty is not what it once was and is far less significant today than it was in 1787 or 1789. It is true, however, that the Constitution of the United States does offer the States with small populations (no matter when they may have become members of the Union) a guarantee against being deprived of equal representation in the Senate without their consent. Counties, at least in Maryland, remain creatures of the State and they have no such constitutional guarantee.

Also, we think that the appellants are right in contending that Maryland does not fully follow the Federal pattern in another respect. The majority attempts to minimize the departure from the rule of one senator per political subdivision made in the case of Baltimore City. With all due deference to our brothers' reading of local history, the fact seems to stand out

that these concessions to Baltimore City were granted, albeit grudgingly, in recognition of Baltimore's relatively large population and economic importance. There is no corresponding provision in the Federal Constitution.

Strictly, as a matter of history, the pattern of one senator per county or comparable political subdivision was in force only from 1851 to 1864. From 1837 to 1851 Baltimore City, which was a part of Baltimore County, had one senator. Since 1864 it has had first three, later four, and since 1922, six. At the time of the last increase it had slightly over 50% of the population of the State, according to the 1920 census. With 6 senators out of 29 it had about 21% of the representation in the Senate. It seems hardly necessary to point out that none of the six legislative districts comprised in the City of Baltimore constitutes a political subdivision of the State comparable to a county.

The majority attempts to bolster the Federal analogy by the argument that those who drafted the Fifth Amendment (many of whom had also participated in drafting the original Constitution) could not have thought that Due Process of Law guaranteed by the Fifth Amendment was infringed by the Equal Representation Clause applicable to the Senate, and then by first equating Due Process under the Fifth Amendment with Due Process under the Fourteenth (this equation being, we think, true) and by then further equating the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. This argument seems to us highly strained. We know of no basis, historical or otherwise, for thinking that the provision for the equal representation of the States in the Senate—a representation of which no State may be deprived without its consent—was or was intended to be amended, limited, or construed by the Fifth Amendment. We may further note that, although in many instances the Due Process and Equal Protection Clauses may overlap, these two Clauses are separately expressed in the Fourteenth Amendment and that they constitute limitations upon the States, not upon the Federal Government. A further, and we think in itself sufficient, answer to this contention is that *Baker v. Carr, supra,* rests squarely

and expressly on the Equal Protection Clause and is the basis for the remand of *Scholle*.

The imperfections of the analogy to the Federal system are a relatively minor factor in the case, though the analogy itself is one of the main grounds upon which the majority relies. The other ground—and perhaps it really includes the Federal analogy ground—is that history furnishes a rational basis for geographical representation without regard to present glaring disparities in population between areas.

Up to a point, which it may be difficult to locate precisely, there is doubtless some merit to an argument based solely on history, but there must be a limit to its efficacy. A phrase with which all lawyers are familiar is the old saying that the reason for something is historical rather than logical. How far can we go in adopting history as the guide for determining whether there is a rational basis for a patent discrimination? It is almost ironic that this malapportionment of representation to population in this case was (as well as is) worse in the Senate than in the House. Surely, the historical-geographical argument cannot be pushed to the logical extreme of contending that an uninhabited geographical area is entitled to representation in a legislative body. (We need not even stop to consider the problem of who would represent it.) Geography simply cannot be divorced from people as a basis for representation. How large must the population of a geographical political subdivision be in relation to that of other such subdivisions in order to afford a reasonable base for representation? We grant that no exact mathematical rule or guide should be attempted by this Court; but it seems to us that when the disparity in population reaches the point where it has no rational justification, the limit of permissible discrimination is passed. A disparity of 32 to 1, we think, does exceed the permissible limit. In votes for the election of Senators that disparity exists as between voters in Baltimore County and voters in Kent County. If there were no other comparable disparities, it might be of little significance; but there are other comparable disparities, as reference to the figures in Appendix A will show. Thus the disparity as between voters in Prince George's County and in Talbot County is approximately 16½ to 1, as between voters in Montgomery

County and in Garrett County it is approximately 17½ to 1, and as between voters in Anne Arundel County and Queen Anne's County it is approximately 12½ to 1. The maximum disparity in *Scholle* was 15 to 1. Without multiplying comparisons of one county with another, the following composite figures (taken from Appendix B), in which representation in the Senate is divided roughly into thirds, will reveal the general disparity between the most populous subdivisions of the State and the less populous subdivisions:

| Units | 1960 Population | Approximate % of State Population | Approximate % of Senate |
|---|---|---|---|
| Four most populous Counties and Baltimore City (10 Senators) | 2,336,409 | 75 | 34½ |
| Ten least populous Counties (10 Senators) | 214,930 | 7 | 34½ |
| Nine intermediate Counties (9 Senators) | 549,350 | 18 | 31 |

To carry comparisons a step further, the fifteen least populous counties can elect 15 of the 29 Senators. These 15 counties have a combined population of 450,160, or a little over 14% of the State's total population of 3,100,869. That is, approximately one-seventh of the population can elect a majority of the State Senate.

Further comment can scarcely add emphasis to the figures shown in the above table and in the paragraph immediately following it.

The supposed Federal analogy was at least as well known to the Supreme Court as to us, but it did not prevent remand for consideration on the merits of apportionment in the State Senate in *Baker,* in *Scholle,* or in *W. M. C. A.* We cannot think of any logical reason for remanding a case to a lower court for the consideration of a patently untenable ground of constitutional attack. Of the three cases just cited *Scholle* seems most pertinent on this matter. The majority opinion in the instant case seeks to avoid what we think is a necessary implication from the remand of *Scholle* on this point by saying that the Supreme Court did not decide the question. We

think that what the Supreme Court has not decided is whether or not there is a rational basis for the Michigan senatorial apportionment.

We think that the majority of this Court dismisses rather too lightly decisions of the courts of other States or of lower Federal courts from a review of which it finds little to be gained. We think that on the whole these other recent cases seem to support our views rather than those of the majority. In general, they regard both houses of a State legislature as subject to a requirement that there shall be some reasonable relationship between population and representation. This may be shown by a rational explanation of a departure from an exact ratio, and such an explanation will be more readily accepted as to one house if the other is exactly proportioned to population. Some, such as *Baker v. Carr, supra,* on remand (31 L.W. 2003) have deferred action as to one house if the other is almost exactly apportioned according to population.

The opinion of the United States District Court for the Middle District of Alabama, filed July 21, 1962, in *Sims v. Frink,* 205 F. Supp. 245, is carefully reasoned, and, in our estimation, supports the view that even exact, or almost exact, apportionment of one house in a State legislature in accordance with population does not entirely dispense with the need for some reasonable regard for population in the apportionment of the other. To like effect is another very recent Federal District Court decision (July 23, 1962) in the Southern District of Florida, in *Sobel v. Adams,* 208 F. Supp. 316. See, however, the more recent opinion of that court, 208 F. Supp. 319, also reported in the Miami Herald of September 6, 1962, upholding a proposed Florida constitutional amendment which affects both House and Senate, bringing apportionment of the former much more nearly in line with population, but permitting considerable disparities as to the Senate. It was held that population need not be "a major factor" in reapportionment of the Senate. The Supreme Court of Vermont (on July 19, 1962) in *Mikell v. Rousseau,* 183 A. 2d 817, held the apportionment of the Senate of that State to be unconstitutional under the State Constitution. A Kansas County District Court held unconstitutional the apportionment of the Kansas legis-

lature on July 27, 1962. A decision of the Court of Common Pleas of Dauphin County, Pennsylvania, cited by the appellees, expresses views in accord with what we regard as the general trend and simply defers action. It does not involve a final determination on the merits. Nor did *Caesar v. Williams,* 371 P. 2d 241 (Ida.), decided April 3, 1962, reach a final decision on the merits. In Colorado the State Supreme Court in *Stein v. General Assembly,* 31 L.W. 2075, deferred requiring action but a Federal District Court in *Lisco v. McNichols,* 31 L.W. 2107, shortened the time of deferment.

The United States District Court for the Middle District of Tennessee, on remand of *Baker v. Carr, supra,* appears to have taken a view similar to ours that there should be an "equitable" basis of reapportionment of the Tennessee Senate, even though it need not be "fully related to voting strength." See also *Toombs v. Fortson,* 205 F. Supp. 248 (N.D., Ga.), 30 L.W. 2605, in which the District Court held that at least one house would have to be apportioned *strictly* on a population basis and did not decide whether both houses would have to be so apportioned.

A three-judge Federal District Court in Oklahoma has acted to bring about reapportionment of the legislature of that State. *Moss v. Burkhart,* 207 F. Supp. 885, commented on in the "Judicial Highlights" section of the Federal Reporter Advance Sheets for July 9, 1962. Further action in that case (for which we presently have no F. Supp. citation) is reported in *Facts on File,* August 2-8, 1962, to have been taken on August 3, 1962.

In *Sweeney v. Notte,* 183 A. 2d 296 (R. I.), 31 L.W. 2060, the Supreme Court of Rhode Island, though holding that it could not take action to enforce its views in a reapportionment case said: "The Attorney General contends, and petitioners concede, that apportionment along geographical, county, municipal or urban versus rural lines does not necessarily constitute a denial of equal protection if the rationale of such methods can be justified. We are in full accord with such contention, but it is equally true that historical recourse to such apportionment formulae cannot be justified if it results in invidious discrimination. The dilution of the vote of a majority of electors

to one fourth of that enjoyed by others is, in our opinion, so unjust as to be invidiously discriminatory."

See also *Sanders v. Gray*, 203 F. Supp. 158 (N.D., Ga.), involving the Georgia primary election unit vote rule. Probable jurisdiction has been noted but an application to advance for argument was denied in that case, *sub nom., Gray v. Sanders*, 370 U.S. 921, by the Supreme Court. That Court did not adopt the view of Mr. Justice Harlan that leave should be granted the appellants for a stay of the injunction issued by the District Court pending the determination of the appeal.

We also refer to the remarks of two University of Virginia political scientists, Messrs. Paul T. David and Ralph Eisenberg, at the recent annual convention of the American Political Science Association in Washington. They discussed the need for representation with reasonable regard to population in both houses of a state legislature and expressed views thereon, as reported in the Washington Post of September 6, 1962 (pp. 1 and A 8) in general accord with ours.

In the present case we think that the gross disparities which exist in relative voting power (and which are not even disputed, for they cannot be) cast upon the proponents of the existing apportionment the burden of showing a rational basis for such departures from any regard for population as a basis for representation. This burden, in our estimation, has not been met. Such provisions as we have here seem much more than are required to assure a proper diffusion of political restraint, to paraphrase the diffusion of political initiative spoken of in *MacDougall v. Green*, 335 U.S. 281, at 284. Neither the long continuance of disparities nor the magic phrase "Federal analogy" seems to us to furnish the rational basis for such disparities which is necessary to save them from constituting "invidious discriminations" under the Fourteenth Amendment, as we think that Amendment has been authoritatively interpreted by the Supreme Court in the cases above referred to and recently decided by that Court.

We, therefore, think that the decree of the Circuit Court should have been reversed.

# APPENDIX A

## Population and Representation in the General Assembly of Maryland

| Unit | Prior to 5-31-62 Population 1960 | HOUSE OF DELEGATES Prior to 5-31-62 No. of Delegates | No. Represented by Each Delegate | After 5-31-62 No. of Delegates | No. Represented by Each Delegate | SENATE No. of Senators | RELATIVE VALUES OF VOTES — Per Cent(%) of Value of Vote to Statewide average* For Delegates Prior to 5-31-62 | For Delegates After 5-31-62 | For Senator |
|---|---|---|---|---|---|---|---|---|---|
| State as a Whole | 3,100,689 | 123 | 25,210 | 142 | 21,837 | 29 | 100 | 100 | 100 |
| Allegeny | 84,169 | 6 | 14,028 | 6 | 14,028 | 1 | 175 | 156 | 129 |
| Anne Arundel | 206,634 | 6 | 34,439 | 7 | 29,519 | 1 | 73 | 74 | 52 |
| Baltimore | 492,428 | 6 | 82,071 | 13 | 37,879 | 1 | 31 | 56 | 22 |
| Calvert | 15,826 | 2 | 7,913 | 2 | 7,913 | 1 | 319 | 276 | 675 |
| Caroline | 19,462 | 2 | 9,731 | 2 | 9,731 | 1 | 259 | 224 | 550 |
| Carroll | 52,785 | 4 | 13,196 | 4 | 13,196 | 1 | 191 | 165 | 203 |
| Cecil | 48,408 | 3 | 16,136 | 3 | 16,136 | 1 | 156 | 135 | 221 |
| Charles | 32,572 | 2 | 16,286 | 2 | 16,286 | 1 | 155 | 134 | 328 |
| Dorchester | 29,656 | 4 | 7,417 | 4 | 7,417 | 1 | 340 | 294 | 360 |
| Frederick | 71,930 | 6 | 11,988 | 6 | 11,988 | 1 | 210 | 183 | 149 |
| Garrett | 20,420 | 3 | 6,807 | 3 | 6,807 | 1 | 370 | 321 | 534 |
| Harford | 76,722 | 4 | 19,181 | 4 | 19,181 | 1 | 131 | 114 | 139 |
| Howard | 36,152 | 2 | 18,076 | 2 | 18,076 | 1 | 139 | 121 | 296 |
| Kent | 15,481 | 2 | 7,741 | 2 | 7,741 | 1 | 325 | 282 | 691 |
| Montgomery | 340,928 | 6 | 56,821 | 10 | 34,093 | 1 | 44 | 64 | 32 |
| Prince George's | 357,395 | 6 | 59,566 | 10 | 35,740 | 1 | 42 | 61 | 30 |
| Queen Anne's | 16,569 | 2 | 8,285 | 2 | 8,285 | 1 | 304 | 264 | 644 |
| St. Mary's | 38,915 | 2 | 19,458 | 2 | 19,458 | 1 | 129 | 112 | 249 |
| Somerset | 19,623 | 3 | 6,541 | 3 | 6,541 | 1 | 385 | 334 | 545 |
| Talbot | 21,578 | 3 | 7,193 | 3 | 7,193 | 1 | 350 | 308 | 495 |
| Washington | 91,219 | 6 | 15,203 | 6 | 15,203 | 1 | 166 | 144 | 117 |
| Wicomico | 49,050 | 4 | 12,263 | 4 | 12,263 | 1 | 206 | 178 | 218 |
| Worcester | 23,733 | 3 | 7,911 | 3 | 7,911 | 1 | 319 | 276 | 450 |
| Baltimore City | 939,024 | 36 | 26,001** | 39 | 24,001** | 6 | 97^ | 91^* | 68--- |

* Average number, statewide, of persons represented by each of 29 Senators, 106,920

** Citywide average without regard to inequalities between Legislative Districts

# APPENDIX B

## Comparison of Representation in the Senate of Maryland of the City of Baltimore and the Four Most Populous Counties and of Other Counties

| Group 1 Baltimore City and Four Most Populous Counties: | 1960 Population | Approximate % of Population of State | No. of Senators | Approximate % of Senate |
|---|---|---|---|---|
| Baltimore City | 939,024 | 30.22 | 6 | 20.70 |
| Baltimore County | 492,428 | 15.88 | 1 | 3.45 |
| Prince George's County | 357,395 | 11.53 | 1 | 3.45 |
| Montgomery County | 340,928 | 10.99 | 1 | 3.45 |
| Anne Arundel County | 206,634 | 6.67 | 1 | 3.45 |
| | 2,336,409 | 75.29 | 10 | 34.50 |
| **Group 2** | | | | |
| Ten Least Populous Counties: | | | | |
| Kent County | 15,481 | .50 | 1 | 3.45 |
| Calvert County | 15,826 | .51 | 1 | 3.45 |
| Queen Anne's County | 16,569 | .53 | 1 | 3.45 |
| Caroline County | 19,462 | .63 | 1 | 3.45 |
| Somerset County | 19,623 | .63 | 1 | 3.45 |
| Garrett County | 20,420 | .66 | 1 | 3.45 |
| Talbot County | 21,578 | .70 | 1 | 3.45 |
| Worcester County | 23,733 | .77 | 1 | 3.45 |
| Dorchester County | 29,666 | .96 | 1 | 3.45 |
| Charles County | 32,572 | 1.05 | 1 | 3.45 |
| | 214,930 | 6.94 | 10 | 34.50 |
| **Group 3** | | | | |
| 9 Intermediate Population Counties: | | | | |
| Howard County | 36,152 | 1.17 | 1 | 3.45 |
| St. Mary's County | 38,915 | 1.26 | 1 | 3.45 |
| Cecil County | 48,408 | 1.56 | 1 | 3.45 |
| Wicomico County | 49,050 | 1.58 | 1 | 3.45 |
| Carroll County | 52,785 | 1.70 | 1 | 3.45 |
| Frederick County | 71,930 | 2.32 | 1 | 3.45 |
| Harford County | 76,722 | 2.48 | 1 | 3.45 |
| Allegany County | 84,169 | 2.71 | 1 | 3.45 |
| Washington County | 91,219 | 2.94 | 1 | 3.45 |
| | 549,350 | 17.72 | 9 | 31.05 |

PRESCOTT and MARBURY, JJ., filed the following separate dissenting opinion.

As indicated therein, we fully concur in the able dissenting opinion of Chief Judge Brune. In addition, we deem it appropriate to call attention to the contrast between the conclusion reached by the present majority and what was said in the majority opinion on the first appeal in which two of the majority on the present appeal concurred.

Plaintiffs' bill of complaint alleges malapportionment in both the State Senate and the House of Delegates. The case first reached us after the trial court sustained demurrers to the bill. We reversed, stating that the Supreme Court had made "a strong implication in the *Baker* decision that there must be some reasonable relationship of population, or eligible voters, to representation in the General Assembly, if an apportionment is to escape the label of constitutionally-prohibited invidious discrimination." We then remanded the case with directions to the chancellor to determine whether representation in either or both Houses of the General Assembly was apportioned on a basis involving such discrimination. The chancellor found that the representation in the House was unconstitutionally malapportioned, but made no finding as to the Senate. We again remanded for a decision as to the Senate. It is elementary that if the well-pleaded allegations of the bill failed to state a cause of action with reference to representation in the Senate, neither remand insofar as it concerned that branch of the Assembly was proper. Upon the remand no testimony whatever was taken. The defendants filed an answer in which they admitted substantially all of the allegations of the bill relating to malapportionment, but, even though the majority opinion stated what we quoted above, the defendants stated in their answer that "representation in the Maryland Senate need not be based on nor reasonably related to the present population of the Counties and Baltimore City [and the present majority opinion sustains this contention]." Essentially, the case reaches us now in the same posture as the first appeal, the only difference being that in the first appeal the demurrers admitted the well-pleaded allegations of the bill, and in the present appeal the

answer admits them with minor and insignificant exceptions. On those facts which were held sufficient on the first appeal to state a cause of action as to the Senate as well as the House, the present majority now finds "nothing in the Supreme Court cases [no case on malapportionment has been decided by the Supreme Court since our first opinion] to support the appellants' claim of invalidity in the apportionment of the Maryland Senate."