Peter B. SOBEL, on behalf of himself and all others similarly situated, Plaintiff,

v.

Tom ADAMS, Secretary of State of the State of Florida, Defendant.

Richard H. M. SWANN, Plaintiff,

v.

Tom ADAMS, Secretary of State of the State of Florida, et al., Defendants.

Civ. Nos. 182-62-M, 186-62-M.

United States District Court
S. D. Florida,
Miami Division.

July 23, 1962.

Supplemental Opinion Sept. 5, 1962.

Before JONES, Circuit Judge, and McRAE and DYER, District Judges.

JONES, Circuit Judge.

In these cases, here consolidated, like questions are presented and the same relief is sought. They come before us on final hearing. By the facts stipulated and those of which we take judicial notice it clearly appears, and the Court finds, that the existing provisions of the Constitution and statutes of the State of Florida which relate to the apportionment for the nomination and election of the members of the Senate and House of Representatives of the Legislature of Florida are invidiously discriminatory against the plaintiffs in the within causes and against others similarly situated. Such provisions are in deprivation of the rights of the plaintiffs and their class guaranteed by the Constitution of the United States. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663.

Each of the three representatives in the Florida House of Representatives from Dade County, the most populous county in the State, represents the equivalent of 311,000 people according to the 1960 Federal census. The member from Gilchrist, the least populous county, would represent 2,868 residents. The five most populous counties average one representative for each 106,000 people. The five least populous counties average one representative for each 3,266 people. The membership of the Florida Senate, considered on a basis of representation of numbers, would show a similar disparity between the more populous and the less populous areas.

The defendants have set forth for us the history of legislative apportionment in Florida. They have outlined for us the efforts made to procure apportionment on a less discriminatory basis. These efforts, particularly in recent years, have met with little success and such changes as have been made fall far short of affording any substantial correction of the inequality of representation. Indeed, it would seem that, because of population increases and shifts, the disproportion increased rather than lessened. Without discrediting the efforts

of those who have sought to mitigate the conditions existing from time to time, those efforts did not produce any substantial alleviation of the preexisting invidious discriminations in apportionment, nor do they now afford any rational basis for a reapportionment that will meet the requirement of equal protection of the law. They do not constitute a defense to the claims for relief here asserted.

■ We do not now decide whether or not this Court has the power to enjoin the submission to the voters of Florida of the now pending amendment to the Constitution of Florida which, if adopted, would reapportion the Florida Legislature. We do not relinquish that power if it exists. We think that it is appropriate to do no more at this time than to say that it is the present opinion of the Court that the reapportionment, which the amendment would make does not meet the Federal Constitutional requirement of equal protection.

The defendants point to Shiver v. Gray, Secretary of State, 5th Cir. 1960, 276 F. 2d 568, as a case squarely in point and a precedent which should control our decision. It need only be noted that this opinion was rendered prior to and is in conflict with Baker v. Carr, supra, and is not to be followed.

■ We find that the Court has jurisdiction of the parties and of the subject matter of the causes; that justiciable matters are presented for decision, and that the plaintiffs have standing to bring and maintain these suits.

We conclude that the constitutional and statutory provisions of the State of Florida, which provide for the apportionment and reapportionment, are null, void and prospectively inoperative.

The plaintiffs and the class represented by them are entitled to such relief as will afford them equal protection of the laws. Before the entry of a final judgment or decree the Court should have the benefit of further evidence and argument on the manner in which the relief should be awarded. The more desirable means of accomplishing the necessary reapportionment is through state action. The duty to place the state in compliance with the requirement of the United States Constitution rests primarily and rests heavily upon the state itself. Should the state fail or neglect to perform this obligation with that dispatch which the urgency of the matter requires, then the less desirable reapportionment by judicial decree would be required. It seems that there is ample time for a valid reapportionment to be made and become effective prior to the time for the convening of the regular legislative session in 1963.

■ In order to permit the State of Florida and its officials to undertake a compliance with the requirements of the United States Constitution, it seems appropriate that the entry of a decree be deferred for a reasonable period of time. If, at the end of that period, the Florida Legislature has been convened in special session for effectuating, by legislation or by amendment to the Florida Constitution, or both; or if at that time some other state action has been undertaken, an application for a further continuance would be looked upon with favor. Otherwise the Court will then proceed to fashion a remedy of reapportionment by judicial decree in such manner as may seem to the Court best adapted to meet the requirements of equal protection.

### INTERLOCUTORY JUDGMENT

This consolidated cause came on to be heard this day upon the pleadings, the stipulations made and the evidence submitted, and argument of counsel being heard, it is

ORDERED, ADJUDGED and DE-CREED:

1. That this statutory three-judge court has been duly constituted, has jurisdiction of the parties and subject matter of the consolidated cause, and has power to adjudicate the controversy presented and to grant such relief as may be appropriate.

2. The Court concludes and hereby determines that the existing constitu-

tional and statutory provisions relating to the apportionment and reapportionment for the nomination and election of the Senate and the House of Representatives of the Florida Legislature are invidiously discriminatory against the plaintiffs and others similarly situated, and deny to them equal protection of the law as guaranteed by the Constitution of the United States. Said provisions are hereby found and declared to be prospectively null, void and inoperative.

3. The consolidated cause is hereby continued until August 13, 1962, at which time the Court will consider the relief to be granted by its final judgment.

### Supplemental Opinion

In the opinion of this Court of July 23, 1962, it was found that the Court has jurisdiction of justiciable issues which the plaintiffs have standing to raise. It was also found that the existing provisions of the Constitution and statutes of the State of Florida which relate to the nomination and election of the members of the Senate and the House of Representatives of the Legislature of the State of Florida are invidiously discriminatory and in conflict with the Equal Protection clause of the Fourteenth Amendment. The Court recognized the duty of the State of Florida to recast its legislative apportionment so as to be in harmony with federal constitutional requirements. In its hope, then and now entertained, that reapportionment would be accomplished by state action, and in its desire to avoid, if possible, the imposition of predetermined judicial formulae, the Court refrained from laying down any straight-jacketing criteria. The Court continued the cause until August 13, 1962. On July 24, 1962, the Governor of Florida issued a call for the Legislature to convene in extraordinary session on August 1, 1962, for the sole purpose of considering reapportionment of the Florida Legislature. The Legislature met, took action and adjourned.

The Legislature withdrew from electoral consideration the proposed amendment to the Florida Constitution relating to legislative apportionment which it had submitted at its 1961 session. S.J.R. No. 216, Laws of Florida, Acts of 1961, p. 1165. A new proposal for a constitutional amendment, incorporated in House Joint Resolution 30X, passed both Houses and, unless prohibited by judicial decree, will be submitted to the voters of Florida at the regular election to be held in November, 1962. The proposed amendment would continue the bicameral legislature which Florida has had since it became a state. It would carry on the traditional division of the State into senatorial districts composed of one or more counties and the allocation of one or more representatives to each county. The proposed amendment would give one representative to each of the counties of the State. Provision would be made for representative ratios. A representative ratio is defined as the quotient obtained by dividing the population of the State by the number of counties. Each county would have one additional representative for each representative ratio or major fraction thereof. Any county having more than four representative ratios shall have another representative. The Senate is to consist of forty-six members, each representing a district. Each of the twenty-four most populous counties shall constitute a district. The other twenty-two districts are to be created from the remaining forty-three counties. In 1971 and every ten years thereafter the Legislature is to reapportion itself in accordance with the constitutional requirement.

The Legislature enacted two statutes to implement the proposed constitutional provision, each to become effective upon the adoption of the constitutional amendment. One of these would make an apportionment of the members of the House of Representatives in accordance with the formula set out in the proposed amendment. Dade County would have fifteen representatives, Duval eight, Hillsborough, Pinellas and Broward Counties would each receive seven representatives, Orange would get five,

Palm Beach and Polk would each be given four, and Escambia, Volusia and Brevard Counties would each be allotted three representatives. The next thirteen counties, ranked by population, would receive two each. The remaining forty-three counties would have a single representative.

The other statutory enactment would make provision for senatorial districts of the number specified in the proposed amendment. The counties to comprise these districts, the district numbers given to them, and the populations of the several proposed districts are as shown on the following map.

46 SENATORIAL DISTRICTS

CREATED BY SENATE BILL NO. 21-X (62)

SHOWING 1960 POPULATION

| District | County | 1960 Census | % of State |
|---|---|---|---|
| 1 | Santa Rosa | 29,547 | .60 |
| 2 | Escambia | 173,829 | 3.51 |
| 3 | Walton, Holmes | 26,420 | .53 |
| 4 | Jackson | 36,208 | .73 |
| 5 | Wakulla, Liberty, Franklin | 14,971 | .30 |
| 6 | Gadsden | 41,989 | .85 |
| 7 | Polk | 195,139 | 3.94 |
| 8 | Leon | 74,225 | 1.50 |
| 9 | Hernando, Sumter, Citrus | 32,342 | .65 |
| 10 | Taylor, Lafayette | 16,057 | .32 |
| 11 | Pinellas | 374,665 | 7.57 |
| 12 | St. Lucie | 39,294 | .79 |
| 13 | Dade | 935,047 | 18.88 |
| 14 | Columbia | 20,077 | .41 |
| 15 | Bradford, Clay, Union | 38,024 | .77 |
| 16 | Nassau, Baker | 24,552 | .50 |
| 17 | Hamilton, Suwannee | 22,866 | .46 |
| 18 | Duval | 455,411 | 9.20 |
| 19 | Orange | 263,540 | 5.32 |
| 20 | Marion | 51,616 | 1.04 |
| 21 | Dixie, Levy, Gilchrist | 17,711 | .36 |
| 22 | Madison, Jefferson | 23,697 | .48 |
| 23 | Lake | 57,383 | 1.16 |
| 24 | Lee | 54,539 | 1.10 |
| 25 | Bay | 67,131 | 1.36 |
| 26 | Putnam | 32,212 | .65 |
| 27 | Hardee, Desoto | 24,053 | .49 |
| 28 | Volusia | 125,319 | 2.53 |
| 29 | Martin, Okeechobee | 23,356 | .47 |
| 30 | Broward | 333,946 | 6.74 |
| 31 | St. Johns, Flagler | 34,600 | .70 |
| 32 | Alachua | 74,074 | 1.50 |
| 33 | Osceola | 19,029 | .38 |
| 34 | Hillsborough | 397,788 | 8.03 |
| 35 | Palm Beach | 228,106 | 4.61 |
| 36 | Manatee | 69,168 | 1.40 |
| 37 | Brevard | 111,435 | 2.25 |
| 38 | Pasco | 36,785 | .74 |
| 39 | Glades, Hendry, Collier | 26,822 | .54 |
| 40 | Okaloosa | 61,175 | 1.24 |
| 41 | Sarasota | 76,895 | 1.55 |
| 42 | Monroe | 47,921 | .97 |
| 43 | Indian River | 25,309 | .51 |
| 44 | Highlands, Charlotte | 33,932 | .68 |
| 45 | Seminole | 54,947 | 1.11 |
| 46 | Washington, Gulf, Calhoun | 28,608 | .58 |
| TOTAL | | 4,951,560 | 100.00 |

It is asserted by the plaintiffs, by the defendant Supervisor of Registration of Dade County, and by the Mayor of the City of Miami appearing amicus curiae in his own behalf as a citizen and voter, that the legislative apportionment which would result from the proposed constitutional amendment is invidiously discriminatory and should be disapproved by the Court. The work of the legislature is defended by the Attorney General of Florida, representing the defendant Secretary of State, and by three members of the Florida House of Representatives appearing amici curiae as citizens and voters. In the hearing of this case the County Attorney of Dade County, appearing on behalf of the Supervisor of Registration of that County, made the observation that "the question presented is whether the proposed apportionment under consideration produces representation that is rational and without invidious discrimination." Such, we agree, is a proper statement of the problem before us.

This litigation, like suits pending or decided in perhaps half or more of the states, was precipitated by the decision of the Supreme Court in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. This landmark decision is important here, not only for that which is decided but for that which is undecided. In the opinion it is said:

> "[W]e hold today only (a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) because appellees raise the issue before this Court, that the appellants have standing to challenge the Tennessee apportionment statutes." 369 U.S. 186, 197–198, 82 S.Ct. 691, 699.

It was noted by the Court that the District Court would be able to fashion relief if violations of constitutional rights were found. It was stated by the Court that it was not necessary to decide whether the plaintiffs would, on a trial, be entitled to relief. This and no more is the holding of Baker v. Carr. It is not required that, in all events, either or both houses of a bicameral legislature must be apportioned upon a population basis of either exact or approximate equality of representation. It is only when the discrimination is invidious or lacking in rationality that it clashes with the Equal Protection clause of the Fourteenth Amendment. Mr. Justice Clark suggests that there must be a plan that follows a rational policy. 369 U.S. 186, 258. Mr. Justice Douglas, in his concurring opinion in Baker v. Carr, notes that "Universal equality is not the test; there is room for weighting." Mr. Justice Douglas cites Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563, for a statement of the rule that "the prohibition of the Equal Protection Clause goes no further than the invidious discrimination." 369 U.S. 186, 244–245, 82 S.Ct. 691, 724.

It is our considered view that the rationality of a legislative apportionment may include a number of factors in addition to population. Certainly it cannot be said that the proposed apportionment of the Florida Legislature reaches approximate equality on a strict basis of population. In Florida, from the inception of its statehood, every county has had at least one member of the House of Representatives. The earliest Constitution of the State provided that there should be given "one representative to every county." Fla.Const.1838, Art. IX, Sec. 1. Such was the provision of the intervening Constitutions. Fla.Const. 1861, Art. IX, Sec. 1; Fla.Const.1865, Art. 9, Sec. 1; Fla.Const.1868, Art. XIII, Sec. 1. Such is provided by the present Constitution of the State. Fla. Const.1885, Art. VII, Sec. 3, F.S.A.

Most of the cities and towns in Florida have been created by special acts of the Legislature. Except for Dade County which has a home rule charter, much of the law relating to the county governments is in the form of special acts of the Legislature. The State of Florida has not, as has been done in some states, provided for uniform legislation regulat-

ing and providing for the government of counties and the municipalities within them, and prohibiting special legislation for cities, towns and counties. In the 1961 session of the Florida Legislature 1266 special acts were passed relating to counties and municipalities. One or more of these special acts applied to each of sixty-four of Florida's sixty-seven counties, and to over a hundred municipalities. The enactment of the special acts is procured by the legislative delegations from the affected areas with the heavier burden resting upon the member or members of the House of Representatives from those counties which are joined with another or others in senatorial districts. The measures included in these special acts are of vast importance to the people of the respective counties or municipalities to which they apply. We are not convinced that this phase of the exercise of state sovereignty could be adequately carried out if a substantial number of the less populous counties of the State of Florida were deprived of the benefit of representation in the Legislature. The way of the State of Florida in providing for the government of its counties and municipalities may not be the best of possible methods but we are not willing and doubt that we are able to require that it be changed. We do not think it would be reasonable to render unworkable the system by which a very large part of the State's legislative function is exercised. Such would be the result of a requirement that counties should be combined into districts for the apportionment of the members of the House of Representatives. The consolidation of many of the smaller and less populous counties with a contiguous one has been suggested. Desirable as this might be, it is not a cure for malapportionment which we are authorized to administer. The Supreme Court of Florida, in a headnote by the Court, has said:

"A county is a political subdivision of the state, created for administrative purposes, is representative of the sovereignty of the state and auxiliary to it. Its functions are of a public nature; it is political in character, and constitutes the machinery by and through which many of the powers of the state are exercised." Keggin v. Hillsborough County, 71 Fla. 356, 71 So. 372.

We conclude that it is not invidiously discriminatory for the citizens and voters residing in each of these political subdivisions to be represented in the House of Representatives. We make the determination that it is entirely rational for the people of each of these representatives of the sovereignty of the state to elect at least one of their own number to represent them in their Legislature.

■ Once it has been determined, and we do so determine, that it is permissible so to apportion the Florida House of Representatives as to allot at least one member to each county, the question arises as to whether this can be and that there also be an apportionment on a strict basis of population. It is obvious that this cannot be done. To have such an apportionment would create a body of such size that its physical accommodation would be difficult if not impossible. Its numbers would create an unwieldy body incapable of functioning with that deliberation which we associate with the legislative process. In designing the formula for apportioning the House the population factor weighed heavily. It was, if not the predominant factor, second only to that of county representation. If apportionment of the House of Representatives were to be based solely upon population by counties a majority would be from five counties; the Dade and Broward portion of the Lower East Coast, the Hillsborough and Pinellas locale of the Tampa Bay area, and Duval County in the Northeast part of the State. On a basis of representation only by population the fifty least populous counties would have no more seats in the House than Dade County, the most populous of the counties. The zeal of the advocates of strict apportionment by a rigid population allocation fails to convince us that the results so achieved

would be rational. The plan proposed by the Legislature of a representative from each county with additional representatives distributed on a basis of a population ratio seems to us to provide a formula which secures the desirable county representation and a reckoning, to the extent required, of the population factor.

The Senate apportionment as proposed by the Legislature might seem, at first blush, to resemble the crazy quilt to which Mr. Justice Clark referred in his concurring opinion in Baker v. Carr, 369 U.S. 186, 258, 82 S.Ct. 691, 7 L.Ed.2d 663. But a study of the groupings which the Legislature has made discloses a pattern not without logic and reason. The apportionment is by districts, forty-six in number. Districts are of counties or groups of two or more counties. No county is divided into two or more districts. Thus Dade County, whose population is nineteen per cent. of that of the State, has but one of the forty-six Senators. Thirty other counties comprise senatorial districts, and fifteen districts are composed of two or three counties. Because such a large portion of the legislative function in Florida deals with special acts applicable only to a single county or municipality, we think it would be unwise and illogical to provide for more than one Senator from any one county, except perhaps from Dade which enacts its own local legislation. Under the plan before us the House of Representatives would be apportioned by a formula in which population is heavily weighted. Because of this we think that population need not be a major factor in the apportionment of the other House. Such apportionment must, however, be made upon a rational basis.

In the proposed groupings of the counties forming the senatorial districts there is, we find, not only common geographical locations and contiguous areas, but a somewhat general unity of economic interests which result in the combinations being desirable for the purpose of legislative representation. So too, it may be said that logic has dictated, in most instances, the absence of some groupings into districts which might have been made if location and population were the sole considerations. Holmes and Walton Counties are joined in District 3. These counties are agricultural in character and have common interests and objectives. Although these counties have an aggregate population of less than 27,000, it would seem reasonable not to join them with their larger neighbor on the West, Okaloosa County which has a population of over 60,000 and has within its boundaries the large Eglin Air Force Base. Nor would it seem illogical to refrain from combining it with Washington County on the East since it is combined with two other counties. The Legislature concluded that no more than three counties should be combined in a single senatorial district. We cannot say that such conclusion is not well-founded. It would seem improper to put these counties in the same district with Bay County and its 67,000 people who have in their midst a large papermill, a Navy base and a thriving tourist activity.

District 5 is composed of Wakulla, Liberty and Franklin Counties forming a compact area near the beginning of the Florida Panhandle. For the most part their economy is the same, although Wakulla has a greater tourist play than the others. So also Franklin has a much greater fish and oyster production than Wakulla. Liberty is an inland county and has but little of commercial fishing on the Apalachicola River. Other examples might be cited. It is possible, even probable, that alignments of counties have been made with no more logic than flows from the necessity of creating districts from neighboring counties. It is possible, but we refrain from saying probable, that some of the county alignments or absence of alignments were the result of the political necessity of concessions in order to procure the passage of the measures we have before us. Disparities and departures from the plan may be pointed out but these are mainly of a de minimis nature and are not such as, in our judgment, render the plan in-

vidiously discriminatory or rob it of its rationality. Like the proposed apportionment of the Florida House of Representatives, that which has been proposed for the Senate meets the test of constitutional equal protection.

The need for reapportionment arises, we are told, because of a strangle hold which the rural areas have had upon the Florida Legislature. What is urban and what is rural, so far as a county is concerned, may depend upon a point of view. For example, Polk County is the eighth Florida county in population. Nine of its cities have in excess of 2,500 residents. Less than half of the county population live in these nine cities. The county is usually thought of as a citrus growing, cattle raising, agricultural area. Yet it has highly unionized citrus packing and canning plants. Nearly 70 per cent. of the world's supply of phosphate is mined in Polk County and much of it is processed there into chemicals, fertilizers and building materials. Polk County, it would appear, is neither urban nor rural but has attributes of both. An area which was rural yesterday may cease to be so tomorrow. The 1950 census showed Brevard County as having a population of 23,653. In 1960 the population was 111,435. Not too long ago the persons living in the county derived their income from citrus growing and packing, the raising of gladioli, sawmilling, and cattle raising, in addition to a thriving tourist business. It was a rural county. The installations of the Federal Government at Cape Canaveral provide payrolls for 40,000 or more persons. The county has less of its former rural character.

If there has been any strangle hold we think the proposed plan will result in the breaking of it. If there are inequitable spots in the proposed scheme they can be eliminated in future legislative sessions or, if need be, by a further change in the Florida Constitution. If any constitutionally unequal discrimination develops and the Legislature neglects its duty, then an application can again be made to the courts for relief.

In dealing with a problem which is not wholly devoid of a political tinge, our confidence in the correctness of our decision would in some measure be enhanced by the sharing of our views by those skilled in statecraft. The plan incorporated in the proposed constitutional amendment and implementing legislation is not the same as, but is not too different from, that which the Governor of Florida presented to the Legislature. Former Governor Warren, during the session of the Legislature, recommended that it pass the Governor's plan or something closely resembling it.

Since 1946 the Florida Bar has had a Constitution Committee engaged in a study of the Florida Constitution and of proposals for its revision and amendment. On this Committee many distinguished lawyers have served, some of whom are members of the Legislature. Its drafts of the article relating to apportionment is very like that which will come before the voting citizens in November.

There is a presumption that the provisions of a state constitution or statute are not invalid when measured by the Constitution of the United States. This presumption will attach to the proposed amendment to the Florida Constitution and to the legislation dependent upon it. That presumption prevails.

The plaintiff Peter B. Sobel has filed a motion for the entry of a judgment apportioning both Houses of the Florida Legislature. The motion will be denied.

If the constitutional amendment which the Florida Legislature has submitted to the electors of the State for ratification or rejection at the general election in November of this year is ratified, the State will have then adopted a rational plan of reapportionment, free from invidious discrimination. This cause will then have become moot and should then be dismissed. If the proposed amendment is rejected further appropriate ac-

tion can be taken by the Court and jurisdiction will be retained for that purpose. Meanwhile the cause will be continued.

An order will be entered to give effect to the conclusions herein set forth.