**Harry R. MOSS, Plaintiff,**

v.

**William A. BURKHART, State Treasurer et al., Defendants.**

**Civ. No. 9130.**

United States District Court
W. D. Oklahoma.

July 17, 1963.

---

10. See this Court's similar analysis in Stern & Co. v. State Loan & Finance Corp., D.C.Del., 205 F.Supp. 702, 707.

Sid White, Oklahoma City, Okl., for plaintiff.

Otjen, Carter, Huddleston & Otjen, Enid, Okl., V. P. Crowe, Trimble B. Latting, Oklahoma City, Okl., U. Simpson Tate, Wewoka, Okl., Amos T. Hall, Tulsa, Okl., E. Melvin Porter, John Wagner, Delmer Stagner, Fred Hansen, Norman Reynolds, Oklahoma City, Okl., Jim A. Rinehart, El Reno, Okl., Leon S. Hirsh, Oklahoma City, Okl., Robert Blackstock, Bristow, Okl., G. D. Spradlin, Herbert F. Hewett, Oklahoma City, Okl., Richard K. McGee, Tulsa, Okl., Tom Tate, House of Representatives, for defendants.

Before MURRAH, Circuit Judge, and RIZLEY and DAUGHERTY, District Judges.

PER CURIAM.

This matter came on for further hearing on March 8, 1963, pursuant to Order of August 3, 1962, 207 F.Supp. 885. The plaintiff Moss, appeared by his attorney, Mr. Sid White. Mr. Norman Reynolds, who represented the Governor when these proceedings were commenced, appeared pro se and with Mr. G. T. Spradling, attorney for the Council Of Democratic Neighborhood Clubs. Mr. Delmer Stagner, who represented Mr. William Burkhart, State Treasurer, when these proceedings were commenced, appeared for Mr. Burkhart, individually, as an intervening plaintiff. Mr. Charles Nesbitt, Attorney General, who has succeeded to office since the August hearing, and his First Assistant, Mr. W. J. Monroe, appeared representing the present State Treasurer, Cowboy "Pink" Williams, substitute defendant for Mr. Burkhart; Mr. S. F. Shaw, State Auditor, substitute defendant for Mr. Andy Anderson; the members of the Oklahoma Tax Commission, who were original defendants and now compose the Commission; and, the present members of the State Election Board, substitute defendants for the original defendant members. The present Governor of the State, who succeeded to his office since the commencement of the proceedings, did not appear in person or by counsel. His predecessor having been made a party, and having participated in the proceedings, the present Governor is automatically substituted as a party, upon succession to the office. The intervening State Senators and the parties intervening as Oklahomans For Local Government, appeared by their attorneys, Mr. James Rinehart, Senator Walt Allen, Mr. Leon Hirsh, and Mr. James C. Harkin. Mr. Frank Carter appeared for the Oklahoma Farm Bureau and Mr. Lewis H. Munn. Mr. Richard McGee was allowed to intervene for Mrs. Phyllis P. Brodski, a taxpayer and registered voter. Mr. Tom Tate appeared, as a member of the House of Representatives, and filed a Memorandum. Mr. U. Simpson Tate appeared as attorney for A. Willie James, J. W. Simmons, J. W. Tyler and Amos T. Hall, as interested parties, and has filed Requested Findings Of Fact and Conclusions Of Law. The Congress Of Parents And Teachers, and The League Of Women Voters filed separate

briefs amicus curiae, in support of their respective plans for reapportionment.

Pursuant to the August, 1962 hearing, on Motion of the intervening Senators and Oklahomans For Local Government, to alter and amend the interlocutory decree of June 19, 1962, the Court did clarify the decree to apply to the elections of 1964 and all future elections following the 1962 election, which was then in being. Upon consideration of the remedies urged upon the Court at the August hearing, for redress of the deprivation or impairment of voting rights, vouchsafed to the plaintiff and his class by the Fourteenth Amendment, the Court decided to defer further action to the 1963 general session of the Oklahoma Legislature, to be convened early in the following January. Further hearing on the remedies to be afforded the aggrieved class, was accordingly passed until March 8, 1963.

In the extraordinary circumstances, it was deemed appropriate to promulgate some guidelines or standards which, in the judgment of the Court, would insure compliance with the equal protection of the laws, with respect to the exercise of suffrage rights for the election of members of both branches of the Oklahoma Legislature. Consistent with our previously declared fundamental principle of apportionment based on substantial numerical equality, as firmly enunciated in the Oklahoma Constitution, and our concept of the requirements of the Fourteenth Amendment, we stated that the House of Representatives should be reapportioned in accordance with the mandate of the Oklahoma Constitution, except as to the ceilings established in Section 10(d), Article V for populous counties. As to that, we were of the view that the arbitrary restrictions thus imposed, were invidiously discriminatory against the plaintiff and his class, hence, constitutionally intolerable. We left the matter of forming Legislative Districts among the counties, for both the House and the Senate, to the discretion of the Legislature, subject only to the requirement of the Oklahoma Constitution and

the Fourteenth Amendment with respect to substantial numerical equality and contiguity, " * * * so that each voter of the state will have approximately the same power and influence in electing members of the two Houses of the Legislature and in shaping legislation, as every other voter." Jones v. Freeman, Okl., 146 P.2d 564, 567. In that respect, we recommended the Proposed Order And Decree, filed on July 30, 1962, by the then Acting Attorney General, as a practical and helpful guide to the orderly reapportionment for both Houses. See: Price v. Moss; Oklahoma Farm Bureau v. Moss, D.C., 207 F.Supp. 885; Review Denied, 374 U.S. 103, 83 S.Ct. 1687.

Having thus invoked the spirit and intent of the Oklahoma Constitution, as a reliable guide for compliance with the Fourteenth Amendment, and having been assured by the leaders of the Oklahoma Legislature, in open Court, that once their constitutional duty was made clear, it would be discharged with befitting honor and fidelity, we withheld any redress for deprivation of the plaintiffs' rights, by the prolonged malapportionment. We were also mindful of the pendency of an Initiative Petition, providing for a Constitutional Commission, to reapportion the Legislature in accordance with the Oklahoma Constitution, and the prospects of its submission to the people at the November election.

At the November election, the Initiative Petition did receive an affirmative majority of the total votes cast on the Petition (335,045 to 273,287, or a majority of 61,758). The then Governor proclaimed that it had become law. The Commission created thereunder was constituted, and proceeded to reapportion both houses of the Legislature, in accordance with the Oklahoma Constitution, except only to the extent necessary to comply with the guidelines set out in the August 3, 1962 Order of this Court.

The intervening Senators filed in the Oklahoma Supreme Court, an original action to annul the Initiative Petition, on the ground that it had not received the

constitutionally required affirmative vote, and to litigate the identical constitutional issues heretofore presented for decision in this proceedings. On petition of the plaintiff and his class, to enjoin the intervenors from prosecuting the original proceedings in the Supreme Court of Oklahoma, we restrained the parties from relitigating the constitutional questions presented here, but deferred to the Oklahoma Court the resolution of the question whether the Initiative Petition had become the law of the State. See: Memorandum Decision Granting Restraining Order, attached as Appendix "A"; Review Denied, Baldwin v. Moss, 374 U.S. 93, 83 S.Ct. 1687, 10 L.Ed.2d 1026. In the State proceedings, the Supreme Court determined that the Initiative Petition "failed of adoption for lack of sufficient affirmative votes." Allen v. Burkhart, Okl., 377 P.2d 821.

When this cause came on for hearing on March 8, 1963, for further consideration of the remedy to be afforded to the plaintiff and his class, the intervening Senators offered Oklahoma Senate Resolution No. 8 and Enrolled House Bill No. 586, and urged them upon the Court, as an appropriate and adequate remedy for the malapportionment of the Oklahoma Legislature under previously existing legislation. They took the position that the legislation complied with the Oklahoma Constitution and with the equal protection clause of the Fourteenth Amendment. The plaintiff and allied intervenors took the position that the legislation was wholly inadequate to achieve constitutional reapportionment, and to provide the remedy for impairment of their voting rights. The League Of Women Voters and The Congress Of Parents And Teachers offered a plan for reapportionment of both Houses of the Legislature, in accordance with a "standard deviation formula," and testimony in support of it. The plan provides a simple and facile method for reapportioning the Legislature on the basis of population.

The legislation urged upon us by the intervening Senators as an appropriate

remedy, has passed both Houses of the Legislature, and has been signed by the Governor, but no effort was made to attach the emergency clause. Article V, Section 58 of the Oklahoma Constitution provides that such legislation does not become effective until ninety (90) days after the adjournment of the legislative session at which the legislation was passed, i. e., June 14, 1963. Moreover, under Article V, Sections 1 and 4 of the Oklahoma Constitution, the legislation may be referred to a vote of the people, on petition of five per cent (5%) of the voters, filed with the Secretary of State, within ninety (90) days after the final adjournment of the session, and before the legislation becomes effective.

■ Since the legislation is not presently effective and may never be effective, it cannot presently affect the rights of the complaining parties, and they, therefore, have no standing to challenge its constitutionality. In this posture, it would be inappropriate for this Court to adjudge the purely hypothetical constitutional question. See: Coffman v. Breeze, 323 U.S. 316, 65 S. Ct. 298, 89 L.Ed. 264; Alabama State Federation of Labor v. McAdory, 325 U. S. 450, 65 S.Ct. 191, 89 L.Ed. 567; Rescue Army v. Municipal Court of Los Angeles, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666; and City of Oklahoma City v. Dulick (10CA), 318 F.2d 830.

But even so, we are immediately concerned with an appropriate remedy for the deprivation of a civil right, and while time is not of the essence of the right, it is, to be sure, an important consideration, if relief is to be granted in the foreseeable future. It is important to note that candidates for legislative office, the term of which expires in November, 1964, must file notification and declaration of candidacy with the Election Board during the filing period, beginning the fourth Monday in February, before the day fixed by law for the regular primary election in 1964. See: 26 O.S. § 163. As the matter now stands, the present legislative apportionment laws have been declared prospectively

null and void, and if the recent legislation should not become effective by reason of the inherent contingencies, there can be no valid election for the legislative offices involved. Enrolled House Bill No. 586 and Senate Resolution No. 8, having been passed and signed by the Governor, cannot be recalled for amendment. If they should be referred to referendum, they must be voted up or down—they either become the law as enacted, or nullified by a vote of the people.

In these circumstances, it becomes manifestly important to settle the apportionment law applicable to the forthcoming election, both in the interest of the plaintiff-electors and those who are to seek legislative office. We are thus brought to the necessity of examining the inchoate legislation, for the purpose of deciding whether, as applicable law, it would afford adequate redress for the deprivation of a civil right. We have examined the legislation with care, and have come to the conclusion that it does not afford the remedy which the Federal Constitution commands.

■ The House Bill purports to comply with the Oklahoma Constitution. It does not purport to comply with the guidelines set out in the August 3, 1962 Order of this Court. But, the legislation is not, for that reason, an unacceptable remedy for invidious discrimination. The Fourteenth Amendment requires precise equality among electors for state-wide offices, or for an office within an electorial district. See: Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821. But, it does not demand precise political equality as between qualified voters, for the election of legislative representatives from different electorial districts. We know that there is "room for weighting" and "rough accommodation," within the framework of the equal protection clause of the Fourteenth Amendment. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; and Norvell v. Illinois, 373 U.S. 420, 83 S.Ct. 1366, 10 L.Ed.2d 456 (Oct. 1962). Our guidelines were not promulgated as an inexorable rule or guide for the achieve-

ment of the equal protection of the laws, in the apportionment of the Oklahoma Legislature. We recognized then, as indeed we do now, that the equal protection clause requires only a rational basis for disparity in voting strength, for legislative representation. Throughout this litigation, however, we have proceeded upon the premise that the gross disparity and deliberate refusal to reapportion, in accordance with the plain mandate of the Oklahoma Constitution, i. e., See: Radford v. Gary, D.C., 145 F.Supp. 541, is prima facie evidence of a hostile disposition to discriminate. And, we have called upon those who would support the disparity to show a rational basis for it.

■ The vice of this most recent legislation lies in the absence of any rational basis for the manifest disparity. In practical effect, it provides little or no relief for malapportionment under antecedent laws. Under this legislation, the Representative Districts vary in population from 11,700 to 62,800. We think it more than coincidental that whereas, under antecedent laws, 29 per cent of the people of Oklahoma could elect a majority of the lower House, under the prospective House Bill, 30.2 per cent can elect a majority of the lower House in the second session of this decennial; 31.2 per cent can elect a majority in the third session; 33.5 per cent in the fourth session; and, in the fifth session, 28.5 per cent may elect the majority. Thus, in this decade, an average of 31 per cent of the people would elect a majority of the lower House, i. e., a 2 per cent increase over the antecedent discriminatory laws. This result is brought about by adherence to the arbitrary ceilings on the number of representatives to be elected from the most populous counties, under Section 10(d), and through skillful manipulation of the "floats," provided in Section 10(e), Article V, of the Oklahoma Constitution.

■ The same invidious purpose is even more manifest in Senate Resolution No. 8, where the disparities between districts run the scale from 115,300 to 24,400, or a ratio of 4.73 to 1. No ra-

tional basis was shown for this disparity. The Resolution does not purport to comply with either the Oklahoma Constitution, or with this Court's guidelines for compliance with the equal protection clause of the Fourteenth Amendment. The Oklahoma Constitution specifically provides that each of the " * * * (electorial) districts shall contain as near as may be an equal number of inhabitants, such population to be ascertained by the next preceding Federal census, or in such manner as the Legislature may direct." Article V, Section 9(a). Presuming to act under color of the latter clause of this constitutional provision, the Oklahoma Legislature in Senate Resolution No. 8 undertook to depart from the decennial Federal census, for what it called the "permanent population . standard," for determining representation. In the first place, a double standard was used to arrive at the legislated apportionment, in that the "permanent population standard" was used in Oklahoma and Tulsa Counties, while the Federal census was used elsewhere. In the second place, the proof shows that the apportionment in Oklahoma and Tulsa Counties is not truly based upon the erected standard. There was nothing to indicate, or from which it can be said, that the classification rests upon any rational basis. Such gross disparity cannot be justified by "historical precedents," as in Maryland Committee For Fair Representation v. Tawes, 229 Md. 406, 184 A.2d 715. Nor, by traditional legislative autonomy of counties, as in Sobel v. Adams, D.C., 208 F.Supp. 316. Nor, by the political, social and economic heterogeneity, recognized in Lisco v. McNichols, D.C., 208 F.Supp. 471. And see same case, 219 F.Supp. 922. We think our situation more nearly like Sims v. Frink, D.C., 208 F.Supp. 431. From the proof before us, it is manifest that the legislative apportionment, under Senate Resolution No. 8, is a patchwork of political maneuvering and manipulation, to perpetuate the same invidious apportionment which prevailed under the antecedent laws. One of the intervening Senators, attorney and spokesman for the group, expressed it quite succinctly and truthfully, we think, when he testified simply that the legislation "was all the Senate would go for."

Intervenors, A. Willie James, J. W. Simmons, J. W. Tyler and Amos T. Hall, specifically attack this legislation as operating to deprive the negro voters in Oklahoma and Tulsa Counties of the equal protection of the laws. They contend that the prescribed districts within those Counties are gerry-mandered, in a manner to effectively discriminate against their race, to the end that their voting strength will be unconstitutionally impaired. In view of the immaturity of the legislation, and our treatment of it for the purpose of this case, we do not reach the issue presented by these Intervenors.

Since the enactment of Enrolled House Bill No. 586 and Senate Resolution No. 8, and following the March 8th hearing of this case, the Legislature has passed Enrolled Joint Senate Resolution No. 4. The Resolution refers to the people proposed amendments to the Oklahoma Constitution, providing for reapportionment of both branches of the Oklahoma Legislature, in accordance with a new formula set forth therein, and providing built-in constitutional means for effecting the reapportionment. It provides that the amendments shall be submitted for adoption or rejection, on the date of the next run-off primary election, which according to State law, will occur in 1964. If the amendments should be submitted and adopted, the Legislature convening in 1965 must act within sixty (60) days, upon failure of which the Apportionment Commission created by the amendments, will proceed to do so, in accordance with the proposed constitutional formula. No one has tendered this Joint Senate Resolution as an appropriate remedy in this case, and we take notice of it only for the purpose of determining whether, in view of its provisions and likelihood of its passage, we should again stay our hand, and await the outcome. In the light of the initiative and referen-

dum history of the State of Oklahoma (see: Appendix—Title 34, O.S.A.) the adoption of the amendments as the constitutional law of this State, seems improbable. Moreover, there is nothing on the face of the proposed amendments to justify the gross disparity between electorial districts for both Houses, as provided therein.[1] In any event, we shall say nor do nothing to interfere with the right of the people to speak freely upon the question. Meanwhile, the improbabilities of its adoption and its doubtfulness as a remedy, will not justify further stay of these proceedings.

After careful consideration of all the exigencies, we have reluctantly decided to reapportion the Oklahoma Legislature by judicial decree, because we are convinced, from all that has transpired in this prolonged proceedings, that the Legislature, as now constituted, is either unable or unwilling to reapportion itself, in accordance with our concept of the requirements of the equal protection clause of the Fourteenth Amendment. We assume this responsibility, fully aware of its gravity and perplexity. We know, of course, that the function of apportioning the State Legislature is essentially legislative in nature; one which the Courts have never before undertaken; and one from which we may very well be precluded, even in the face of inadequate redress for the deprivation of civil rights. We know that the judicial power to grant redress for deprivation of a civil right is usually a negative power, effected by conventional injunctive decree. It may well be that the affirmative relief we grant is in excess of our judicial power. If so, we will know in due time, for the questions are squarely presented, and will undoubtedly be authoritatively decided during the next term of the Supreme Court. See: WMCA, Inc. v. Simon, 374 U.S. 802, 83 S.Ct. 1691, 10 L.Ed.2d 1028; Wesberry v. Sanders, 374 U.S. 802, 83 S.Ct. 1691, 10 L.Ed.2d 1029; Reynolds v. Sims, 374 U.S. 802, 83 S.Ct. 1692, 10 L.Ed.2d 1029; Vann v. Frink, 374 U.S. 802, 83 S.Ct. 1692, 10 L.Ed.2d 1029; Maryland Committee On Fair Representation v. Tawes, 374 U.S. 804, 83 S.Ct. 1691, 10 L.Ed.2d 1029; McConnell v. Frink, 374 U.S. 802, 83 S.Ct. 1692, 10 L.Ed.2d 1029; Davis v. Mann, 374 U.S. 803, 83 S.Ct. 1692, 10 L.Ed.2d 1029; and Wright v. Rockefeller, 374 U.S. 803, 83 S.Ct. 1694, 10 L.Ed.2d 1029. Meanwhile, we shall proceed on the fundamental premise that equity is never impotent or indolent before the law.

In the suggested Findings of Fact and Conclusions of Law, filed by the intervening Senators, we are asked to abstain, and to await adjudication of the constitutionality of this most recent legislation by the State courts. But, in the

1. Section 1 of the Joint Resolution provides that the State shall be apportioned into 48 Senatorial Districts, in the following manner: " * * * the nineteen most populous counties, as determined by the most recent Federal Decennial Census, shall constitute nineteen senatorial districts with one senator to be nominated and elected from each district; the fifty-eight less populous counties shall be joined into twenty-nine two-county districts with one senator to be nominated and elected from each of the two-county districts. * * * " A rough calculation, based upon the Federal census, will show that the disparities between the 19 most populous electorial districts will range from less than 30,000 in the smallest of the one-county senatorial districts, to approximately 440,000 in the largest of the one-county senatorial districts. The disparity is even greater (less than 15,000 to approximately 440,000) between the least populous two-county district and the most populous one-county district. The section creating these districts provides that "consideration shall be given to population, compactness, area, political units, historical precedents, economic and political interests, contiguous territory, and other major factors, * * * " but there is nothing to indicate that consideration was given to these factors in the creation of the districts, which would be immutably created, unless and until changed by further constitutional amendment.

The formula provided in the amendment for reapportionment of the House of Representatives, gives every County one Representative, and by the utilization of ratios, progressively restricts representation in the most populous counties.

circumstances, we think it would be unwise and, in effect, a deprivation of the constitutional rights of the plaintiff and his class, to await State court proceedings, which have not been instituted and which, in any event, would not resolve the ultimate question of the appropriateness of the remedy for the redress of a civil right, asserted in this proceedings. The suggestion will, therefore, be denied.

This brings us to the form of relief which is to be afforded, or more specifically, the form of Order for the remedy. While, as we have seen, the equal protection clause of the Fourteenth Amendment is content with fundamental fairness in the exercise of voting rights, if apportionment is to be our lot, we should not stop short of the ideal. Of all the plans for reapportionment which have been urged upon us, as an appropriate remedy, we have been favored with a formula which approaches the ideal, to reapportion the Legislature "as near as may be to the equal number of inhabitants" of each district. This plan, known in the proof here as Model C, is submitted by The Bureau Of Government Research, of the University of Oklahoma. It represents the judgment of the Acting Attorney General of the State, when this matter was previously under consideration for appropriate remedy. It is an embodiment of the best thinking and contribution of the political scientists and statisticians, who have testified in this case, concerning the critical question of discrimination. We adopted it as our guideline in our August 3rd Order. When State Question No. 408, Initiative Petition No. 271, providing for a Commission to reapportion the Legislature, was declared to have passed, by proclamation of the Governor, the de facto Commission, created thereunder, adopted the Model as affording the most effective plan for reapportioning the Legislature, in accordance with the Oklahoma Constitution and the guidelines of our August 3, 1962 Order. We now adopt it as the pattern for Final Judgment of this Court, and in accordance with the following Order Of Reapportionment.

## ORDER OF REAPPORTIONMENT

The Legislature of the State of Oklahoma is hereby apportioned, as hereinafter provided, for the purposes of all future elections within the Decennial, beginning the 16th day after the general election in November, 1962 and ending the 15th day after the general election in November, 1972, unless and until the Legislature, elected and constituted by virtue of this apportionment, shall reapportion itself, in accordance with the requirements of the equal protection clause of the Fourteenth Amendment:

The ten-year period beginning the 16th day after the general election in November, 1962, and ending the 15th day after the general election in November 1972, shall constitute a Decennial Legislative Period of the Legislature of the State of Oklahoma, and said period is hereby divided into five legislative periods of two years each.

*The first legislative period* shall begin on the 16th day after the general election in November 1962, and end with the 15th day after the general election in November 1964. Senators and representatives heretofore elected at said November 1962 general election shall serve during said first legislative period.

*The second legislative period* shall begin on the 16th day after the general election in November 1964, and end with the 15th day after the general election in November 1966.

*The third legislative period* shall begin on the 16th day after the general election in November 1966, and end with the 15th day after the general election in November 1968.

*The fourth legislative period* shall begin on the 16th day after the general election in November 1968, and end with the 15th day after the general election in November 1970.

*The fifth legislative period* shall begin on the 16th day after the general election in November 1970.

## THE SENATE

The Oklahoma State Senate shall consist of 44 members, who shall be apportioned during the second, third, fourth and fifth legislative periods prescribed herein among the 44 senatorial districts of the State. The terms of office of Senators elected in the November 1960 general election, as well as those elected at the November 1962 election, will end with the 15th day after the general election of November 1964. The apportionment of the counties of the State into said 44 senatorial districts, in each of which one Senator will be nominated and elected, shall be as follows:

| DISTRICT NUMBER | | NUMBER OF SENATORS |
|---|---|---|
| District 1 | Beaver, Cimarron, Harper, Texas, Woods, Woodward | 1 |
| District 2 | Beckham, Ellis, Greer, Roger Mills, Washita | 1 |
| District 3 | Harmon, Jackson, Tillman | 1 |
| District 4 | Blaine, Caddo, Kiowa | 1 |
| District 5 | Alfalfa, Custer, Dewey, Grant, Major | 1 |
| District 6 | Kingfisher, Lincoln, Logan | 1 |
| District 7 | Garfield | 1 |
| District 8 | Canadian, Grady | 1 |
| District 9 | Cotton, Jefferson, Stephens | 1 |
| District 10–11 | Comanche | 2 |
| District 12 | Carter, Love, Marshall | 1 |
| District 13 | Atoka, Garvin, Johnston, Murray | 1 |
| District 14 | Pontotoc, Seminole | 1 |
| District 15 | McClain, Pottawatomie | 1 |
| District 16 | Cleveland | 1 |
| District 17–24 | Oklahoma | 8 |
| District 25 | Payne | 1 |
| District 26 | Noble, Osage, Pawnee | 1 |
| District 27 | Kay | 1 |
| District 28 | Nowata, Washington | 1 |
| District 29–35 | Tulsa | 7 |
| District 36 | Okmulgee, Wagoner | 1 |
| District 37 | Creek, Okfuskee | 1 |
| District 38 | Coal, Hughes, Pittsburg | 1 |
| District 39 | Bryan, Choctaw, Latimer, Pushmataha | 1 |
| District 40 | LeFlore, McCurtain | 1 |
| District 41 | Cherokee, Haskell, McIntosh, Sequoyah | 1 |
| District 42 | Muskogee | 1 |
| District 43 | Adair, Delaware, Ottawa | 1 |
| District 44 | Craig, Mayes, Rogers | 1 |
| | | 44 |

PROVIDED, however, that until the Legislature, as apportioned hereunder, shall by appropriate legislation prescribe the boundaries of the Districts, within any one County of the State entitled to elect more than one Senator, under the provisions of this Order, the candidates for such senatorial offices shall be nominated and elected at large within such Counties; and,

PROVIDED FURTHER, that each such senatorial office shall be designated and distinguished numerically, according to the number of Senators and numerical Districts to which such County is entitled, and all filings of notification and declaration for nomination and election, pursuant to 26 O.S. § 163, to any of the offices herein provided, shall designate the number of the office to which the filings are intended to apply.

Senators elected from even numbered Districts for the above second legislative period shall hold office until the 15th day succeeding the general election in November 1966, and Senators elected from the odd numbered Districts for said legislative period shall hold office until the 15th day succeeding the general election in November 1968. The office number and term, in Counties entitled to more than one Senator, shall correspond to the District number and term, as herein provided. The term of office of each Senator thereafter elected shall be four years.

The Election Board of the State of Oklahoma, and all those acting by and under its authority, are hereby ordered and directed to accept filings and conduct elections, in accordance with the provisions of this Order and the applicable provisions of Title 26, Oklahoma Statutes, as amended, and they are hereby enjoined and restrained from accepting filings or conducting elections in any manner inconsistent with the provisions of this Order and the statutes of the State of Oklahoma, not inconsistent herewith.

## THE HOUSE OF REPRESENTATIVES

Representatives assigned to each County for each of the five legislative periods, other than for the first period, shall be elected at the general election in the month of November, next preceding the commencement of the respective legislative period.

The representation in the House of Representatives of each County of Oklahoma for the last four legislative periods defined herein, shall be the number listed in the table hereinafter set forth. The number of representatives assigned to each County for each of the five legislative periods, other than for the first period, is shown in the following table. The name of each County and the names of attached Counties are given in said table, and the number of representatives to which same are entitled are listed under the columns designated for said legislative periods, as follows:

| COUNTIES | 2d Leg. Period | 3d Leg. Period | 4th Leg. Period | 5th Leg. Period |
|---|---|---|---|---|
| Alfalfa-Grant | 1 | 1 | 1 | 1 |
| Atoka-Coal | 1 | 1 | 1 | 1 |
| Beaver-Harper | 1 | 1 | 1 | 1 |
| Beckham-Roger Mills | 1 | 1 | 1 | 1 |
| Blaine-Kingfisher | 1 | 1 | 1 | 1 |
| Cimarron-Texas | 1 | 1 | 1 | 1 |
| Cotton-Jefferson | 1 | 1 | 1 | 1 |
| Dewey-Major | 1 | 1 | 1 | 1 |
| Ellis-Woodward | 1 | 1 | 1 | 1 |
| Greer-Harmon | 1 | 1 | 1 | 1 |
| Haskell-McIntosh | 1 | 1 | 1 | 1 |
| Johnston-Murray | 1 | 1 | 1 | 1 |
| Latimer-Pushmataha | 1 | 1 | 1 | 1 |
| Love-Marshall | 1 | 1 | 1 | 1 |
| Noble-Pawnee | 1 | 1 | 1 | 1 |
| Nowata-Craig | 1 | 1 | 1 | 1 |
| Adair | 1 | 1 | 1 | 1 |

| COUNTIES | 2d Leg. Period | 3d Leg. Period | 4th Leg. Period | 5th Leg. Period |
|---|---|---|---|---|
| Bryan | 1 | 1 | 1 | 1 |
| Caddo | 1 | 1 | 1 | 2 |
| Canadian | 1 | 1 | 1 | 1 |
| Carter | 2 | 2 | 1 | 1 |
| Cherokee | 1 | 1 | 1 | 1 |
| Choctaw | 1 | 1 | 1 | 1 |
| Cleveland | 2 | 2 | 2 | 2 |
| Comanche | 4 | 4 | 4 | 4 |
| Creek | 2 | 2 | 1 | 1 |
| Custer | 1 | 1 | 1 | 1 |
| Delaware | 1 | 1 | 1 | 1 |
| Garfield | 2 | 2 | 2 | 2 |
| Garvin | 1 | 1 | 1 | 2 |
| Grady | 1 | 1 | 2 | 1 |
| Hughes | 1 | 1 | 1 | 1 |
| Jackson | 1 | 1 | 1 | 2 |
| Kay | 2 | 2 | 2 | 2 |
| Kiowa | 1 | 1 | 1 | 1 |
| LeFlore | 1 | 1 | 1 | 2 |
| Lincoln | 1 | 1 | 1 | 1 |
| Logan | 1 | 1 | 1 | 1 |
| McClain | 1 | 1 | 1 | 1 |
| McCurtain | 1 | 1 | 1 | 1 |
| Mayes | 1 | 1 | 1 | 1 |
| Muskogee | 3 | 3 | 2 | 2 |
| Okfuskee | 1 | 1 | 1 | 1 |
| Oklahoma | 19 | 19 | 19 | 19 |
| Okmulgee | 1 | 2 | 2 | 1 |
| Osage | 2 | 1 | 1 | 1 |
| Ottawa | 1 | 1 | 2 | 1 |
| Payne | 2 | 2 | 2 | 2 |
| Pittsburg | 1 | 2 | 2 | 1 |
| Pontotoc | 2 | 1 | 1 | 1 |
| Pottawatomie | 2 | 2 | 2 | 2 |
| Rogers | 1 | 1 | 1 | 1 |
| Seminole | 1 | 1 | 1 | 1 |
| Sequoyah | 1 | 1 | 1 | 1 |
| Stephens | 2 | 2 | 1 | 1 |
| Tillman | 1 | 1 | 1 | 1 |
| Tulsa | 15 | 15 | 15 | 15 |
| Wagoner | 1 | 1 | 1 | 1 |
| Washington | 2 | 2 | 2 | 2 |
| Washita | 1 | 1 | 1 | 1 |
| Woods | 1 | 1 | 1 | 1 |
| | 109 | 109 | 107 | 107 |

PROVIDED, however, that until the Legislature, as apportioned hereunder, shall by appropriate legislation prescribe the boundaries of the Districts, within any one County of the State entitled to elect more than one Representative, under the provisions of this Order, the candidates for such representative offices shall be nominated and elected at large within such Counties; and,

PROVIDED FURTHER, that each such office shall be designated and distinguished numerically, according to the number of Representatives to which such County is entitled, and all filings of notification and declaration for nomination and election, pursuant to 26 O.S. § 163, to any of the offices herein provided, shall designate the number of the office to which the filings are intended to apply.

The Election Board of the State of Oklahoma, and all those acting by and under its authority, are hereby ordered and directed to accept filings and conduct elections, in accordance with the provisions of this Order and the applicable provisions of Title 26, Oklahoma Statutes, as amended, and they are hereby enjoined and restrained from accepting filings or conducting elections in any manner inconsistent with the provisions of this Order and the statutes of the State of Oklahoma, not inconsistent herewith.

APPENDIX "A"
MEMORANDUM OF DECISION
GRANTING RESTRAINING
ORDER

By Order entered January 15, 1963, this Court restrained the intervening senators from further prosecuting in the Oklahoma Supreme Court an original action involving constitutional issues relating to the Oklahoma apportionment laws which are now in process of litigation in this Court and in this suit. Inasmuch as the intervenors have filed notice of appeal from our Order to the Supreme Court of the United States and to the Court of Appeals, and in view of the protracted course of the litigation, it seems appropriate to bring the Order into its proper context.

When this suit was commenced pursuant to Baker v. Carr, the responsible executive state officers who were made defendants all promptly entered their appearance and consented to the jurisdiction of the Court over the subject matter and their person. The Governor, the Secretary of State, the State Treasurer and the State Election Board all answered confessing the truth of the complaint, and agreeing that the complainant and his class were entitled to the relief sought. The Governor, joined by the other defendants, freely confessed that all available state remedies had been exhausted, and that recourse to the federal court under Baker v. Carr was the only remaining course of action. And see statement of the case in Moss v. Burkhart, 207 F.Supp. 885, 889.

At the April 23, 1962 hearing, on plaintiff's application to enjoin the forthcoming May 1st primary election, the responsible defendants urged us to grant an injunction; the Governor offered to convoke an extraordinary session of the Legislature for the purpose of enacting apportionment laws in compliance with the mandate of the Constitution of the State of Oklahoma and the equal protection clause of the 14th Amendment.

After the hearing, but before final decision, a group of individuals calling themselves "Oklahomans for Local Government" were permitted to intervene. They suggested the absence of necessary parties-defendant and further suggested that in view of the confessions of the defendant-state officials, the proceedings was not adversary, and that there should be a realignment of the parties. They specifically denied malapportionment of the Legislature under existing laws and offered to show a rational basis for the existing apportionment. They affirmatively alleged that the apportionment in accordance with the mandate of the Oklahoma Constitution would operate to deny them and their class the equal protection of the laws guaranteed by the 14th Amendment. Finally, it was alleged that

the power to reapportion was vested exclusively in the State Legislature, and that it should be afforded an opportunity to perform its constitutional function either in a special session or the next general session.

At the conclusion of the hearing, the Court sustained its jurisdiction of the subject matter as a justiciable controversy. The majority of the Court refused to enjoin the forthcoming primary election, but called attention to the manifest disparity in the elected representation of both branches of the Oklahoma Legislature, and suggested that on the face of the disparity, the plaintiff was entitled to relief under the plain mandate of the Oklahoma Constitution and the 14th Amendment to the federal Constitution. The case was set for trial approximately 50 days later on the issue of rationality of the admitted disparity. When the case came on for trial, plaintiff and those aligned with him, offered evidence without objection tending to show that the disparity in the legislative apportionment was invidiously discriminatory; that apportionment on a numerical basis was the starting point to achieve equal protection of the laws with respect to the election of representatives to the Oklahoma Legislature. The Attorney General of the State submitted a formula for reapportionment based primarily upon the requirements of the Oklahoma Constitution, modified to comply with the requirements of the 14th Amendment to the federal Constitution. The first intervenors, though present by counsel and participating, offered no evidence on the issue of rationality. Based upon the evidence adduced, the trial court found that the apportionment was invidiously discriminatory, and that the underlying election laws were prospectively void. But no final relief was decreed or granted. Instead, the case was passed until September 10, 1962 for determination of appropriate remedies. At the same time the Court suggested three probable remedies: (1) apportionment by the Legislature in special session; (2) the pending

initiative petition; and (3) judicial intervention only as a last resort. And, in that connection, we noted that in the event it became necessary to bring about reapportionment by judicial intervention, it would be time enough to hear and consider any factors which might enter into the reapportionment equation. See Moss v. Burkhart, 207 F.Supp. p. 895.

Before the date set for the hearing on September 10, the first intervenors moved to alter, amend or clarify the decree. On the day before the motion came on for hearing, and on July 30, the intervening senators, represented by the same counsel who represented the first intervenors, moved for permission to intervene, alleging that they should have been joined as parties from the beginning, and prayed that they be permitted to intervene to protect themselves and "their own civil and political rights." Intervention was allowed. In their answer, they acknowledged jurisdiction of the Court to determine the applicability of the 14th Amendment to the rights and claims of the plaintiff, but denied the power of the court to alter or revise the structure of the legislative department of the State in a manner to interfere with the existence, validity or the incumbency of their respective elective offices. They specifically alleged that any apportionment based upon census population, as provided in the Oklahoma Constitution, would be invidiously discriminatory against them and in contravention of their rights under the 14th Amendment. Finally, they pray "that the issues raised by the plaintiffs and the defendants as herein controverted be tried and determined in the regular course, fully protecting the rights and interest of these answering defendants under the federal Constitution and laws. * * *."

At the hearing on the motion to modify the June 19 interlocutory decree, one of the intervening senators, apparently appearing on behalf of all of the intervening senators, testified in response to direct questions from the court and counsel that he would "vote for * * * and

support * * * with all my might and vigor * * * " the final adjudication of the constitutional issues in this court.

Pursuant to the hearing on the motion to alter and amend, the Court clarified its interlocutory decree of June 19, to specify that it did not affect the validity of the forthcoming general election; and that the interlocutory decree applied prospectively to elections in 1964 and thereafter. Further hearing in the case was set approximately 5 months later on March 8, 1963. Meanwhile, a new Legislature would have been elected and in session for approximately 60 days. As a guideline for an appropriate remedy for the malapportionment, the Court expressed the positive view that the Legislature should be reapportioned substantially in accordance with the Oklahoma Constitution and in accordance with a plan and formula submitted by the State Attorney General.

The initiative referendum providing in substance for the creation of a constitutional commission to reapportion the Legislature in accordance with the existing provisions of the Oklahoma Constitution was submitted to the people on November 6, and the question arose whether the initiative petition had received the required vote of the people and had become the law of the land. The plaintiffs and the responsible state officials sought to clarify the question in this Court as a necessary incident to the determination of appropriate remedies.

About the same time, the intervenors filed a proceedings, first, in the State District Court and then an original proceedings in the Supreme Court of Oklahoma. The original proceedings was an action in the nature of a bill quia temit "to prevent anticipated mischiefs which could not after their occurrence be adequately redressed." The first cause of action sought a declaration to the effect that the initiative petition did not receive the number of required votes and did not become law. The second and third causes of action alleges substantially the same subject matter set forth in their petition for intervention in this case, and seeks substantially the same affirmative relief. When the plaintiffs' motion to declare that the initiative petition had become the law of the State came on for hearing in this case, our attention was called to the pendency of the original proceedings in the state court. We thereupon deferred consideration of the same in deference to action by the State Supreme Court. That Court did assume jurisdiction of the first cause of action, but reserved its ruling "as to whether jurisdiction of the remaining causes of action pleaded by the applicants will be assumed." The Oklahoma Court has now determined that the initiative petition "failed of adoption for lack of sufficient affirmative votes." Allen, et al. v. Burkhart, et al. (Okl.), 377 P.2d 821. That decision is of course binding here. Thereafter the intervenors amended their petition in the Supreme Court of Oklahoma to reassert the same matters and issues originally pleaded here, and on which the Oklahoma Supreme Court had reserved jurisdiction.

As the litigation now stands, the intervenors are in courts of two sovereign jurisdictions, alleging substantially the same subject matter and seeking substantially the same relief. The gloss of the pleadings may be somewhat different, but the subject matter of the lawsuits and the relief sought are essentially the same. The jurisdiction of both courts may be conceded, as indeed it is. The decisive point of consideration is that early in the course of this litigation, the intervenors invoked this court's jurisdiction and consented to its processes. They now seek to circumvent or frustrate that jurisdiction by provoking unseemly state-federal conflict over the same subject matter. In substance, they would remove a case into which they have intervened to another forum. In this posture, it seems important to sensitive areas of this kind that the Court having first acquired jurisdiction of the subject matter should proceed to a final determination of the tedious questions involved. Any attempted division or dual exercise of the concurrent jurisdiction can lead only

to unwarranted confusion, and ought to be avoided. We think that the proper administration of justice and the maintenance of a harmonious state-federal relationship require us to restrain the intervenors from taking their lawsuit elsewhere.